[L.A. No. 31261. Feb. 5, 1981.]

BILL GRAHAM, Plaintiff and Appellant, v.
SCISSOR-TAIL, INC., Defendant and Appellant.

COUNSEL

Mitchell, Silberberg & Knupp and Thomas P. Lambert for Plaintiff and Appellant.

Schwartz & Dreifus and Jordan A. Dreifus as Amici Curiae on behalf of Plaintiff and Appellant.

Fierstein & Sturman, Harvey Fierstein and Mark J. Linder for Defendant and Appellant.

Levy & Goldman, Abe F. Levy, Gerald Goldman and Elizabeth Garfield as Amici Curiae on behalf of Defendant and Appellant.

OPINION

THE COURT.—These are two consolidated appeals. ■ ■ ■ ■ Plaintiff Graham appeals from a judgment confirming the award of an arbitrator.[1] (Code Civ. Proc., §§ 1287.4, 1294, subd. (d), 1294.2.) Defendant Scissor-Tail, Inc., appeals from a special order after judgment taxing costs relating to attorney's fees. (Code Civ. Proc., § 1294, subd. (e).) We will reverse the judgment confirming the award, directing the trial court to vacate its order compelling arbitration (see fn. 1, *ante*) and conduct further proceedings. We will dismiss the appeal from the special order after judgment as moot.

---

[1]Plaintiff also purports to appeal from the order compelling arbitration, a nonappealable order. He is entitled, however, to have the validity of this order reviewed on his appeal from the judgment of confirmation. (See *La Pietra v. Freed* (1978) 87 Cal. App.3d 1025, 1030-1031 [151 Cal.Rptr. 544]; *Atlas Plastering, Inc. v. Superior Court* (1977) 72 Cal.App.3d 63, 67-68 [140 Cal.Rptr. 59]; *Wheeler v. St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 353 [133 Cal.Rptr. 775, 84 A.L.R.3d 343]; *Maddy v. Castle* (1976) 58 Cal.App.3d 716, 719-720 [130 Cal.Rptr. 160].)

## I

Plaintiff Bill Graham is an experienced promoter and producer of musical concerts. Defendant C. Russell Bridges, also known as Leon Russell (Russell), is a successful performer and recording artist and the leader of a musical group; he is also a member of the American Federation of Musicians (A.F. of M.). Defendant Scissor-Tail, Inc. (Scissor-Tail) is a California corporation, wholly owned by Russell, which serves as the vehicle by which the services of Russell and his group are marketed. Defendant David Forest Agency, Ltd. (Forest) was, at the time here relevant, acting in the capacity of booking agent for Scissor-Tail.

Early in 1973, Scissor-Tail and Russell decided to formulate and structure a personal appearance tour for the latter and his group. Forest was engaged to assist in this project, and at the suggestion of Dennis Cordell, Russell's personal manager and an officer of Scissor-Tail, contacted plaintiff Graham, who had previously promoted a number of Russell concerts, to request that he provide his services for four of the twelve concerts on the projected tour. A series of four contracts was prepared covering, respectively, concerts at Ontario, Oakland, Long Island, and Philadelphia. Graham signed all four contracts; Scissor-Tail (per Dennis Cordell), for reasons to appear, signed only those relating to the Ontario and Oakland concerts, which were to occur on July 29 and August 5, 1973.

The four contracts in question were all prepared on an identical form known in the industry as an A.F. of M. form B contract; in this case each bore the heading of the Forest agency. Aside from matters such as date and time, they differed from one another in only two areas—i.e., the contents of the blanks designated "hours of employment" and "wage agreed upon." The former dealt with matters such as hours of performance and the provision of a guest artist to appear on the program prior to the Russell group. The latter provided that payment was to be "applicable A.F. of M. scale" or a specified percentage (85 percent in the case of Ontario, Oakland, and Philadelphia; 90 percent in the case of Long Island) "of the gross receipts after bonafide, receipted, sanctioned expenses and taxes, whichever is greater." Also here indicated in each case was the capacity of the concert site, the price of tickets, and the potential gross.

The contracts designated Graham as the "purchaser of music" or "employer," the seven members of the group as "musicians." They did

not speak explicitly to the question of who was to bear any eventual net losses. The contract forms also provided: "9. In accordance with the Constitution, By-laws, Rules and Regulations of the Federation, the parties will submit every claim, dispute, controversy or difference involving the musical services arising out of or connected with this contract and the engagement covered thereby for determination by the International Executive Board of the Federation or a similar board of an appropriate local thereof and such determination shall be conclusive, final and binding upon the parties."[2]

As indicated above, all four contracts were signed by plaintiff Graham, his signature appearing below his typed name on a blank designated "signature of employer." Only those contracts relating to the Ontario and Oakland concerts bore a corresponding signature; on those contracts, below the typed name "Scissor-Tail, Inc. by C. Russell Bridges aka Leon Russell" and on a blank designated "signature of leader," is the signature of Dennis Cordell, who as above indicated was Russell's personal manager and an officer of Scissor-Tail.

On the second page of each contract is a list of the seven musicians involved (including Russell), together with an indication of the A.F. of M. local of each.

The Ontario concert took place as scheduled and had gross receipts of $173,000 (out of a potential gross reflected in the contract of "$450,000 plus"), with expenses of $236,000, resulting in a net loss of some $63,000. The Oakland concert also took place, resulting in a net profit of some $98,000. Following this second concert a dispute arose among the parties over who was to bear the loss sustained in the Ontario concert and whether that loss could be offset against the profits of

[2]The contracts further provided: "FOR CALIFORNIA ENGAGEMENTS: It is expressly agreed by all parties hereto that all controversies involving any matter within the sole competence of the Federation pursuant to its Constitution, By-laws, rules or resolutions (as distinguished from matters within the competence of the Locals) arising out of this contract shall be submitted to, heard, arbitrated and determined by the International Executive Board of the American Federation of Musicians pursuant to and in accordance with the laws, rules and regulations of the said Federation. All controversies involving matters within the competence of Locals of the Federation arising out of this contract, shall be submitted to, heard, arbitrated and determined by the person, persons, or body specified by the rules, By-laws, or practices of the Local in whose jurisdiction the services have been or are to be performed in accordance with the procedures in such rules or By-laws. The parties hereto agree that when applicable pursuant to Section 1647.5 [now repealed] or section 1700.45 of the Labor Code of California, to provide reasonable notice to the Labor Commissioner of the time and place of any hearing which he shall be entitled to attend." (The parties are agreed that this last provision is not here applicable.)

the Oakland concert—Scissor Tail and Forest taking the position that under the contract Graham was to bear all losses from any concert without offset, Graham urging that under standard industry practice and custom relating to 85/15 and 90/10 contracts such losses should accrue without offset to Scissor-Tail et al. This dispute remaining unresolved,[3] Scissor-Tail declined to execute the contracts for the Long Island and Philadelphia concerts; apparently these concerts took place as scheduled, but some party other than Graham performed the promotional services.

In October 1973, Graham filed an action for breach of contract, declaratory relief, and rescission against all defendants. Scissor-Tail responded with a petition to compel arbitration. After once ordering arbitration, the trial court in 1974 granted reconsideration in order to permit discovery "limited to the issues of whether an agreement to arbitrate was entered into and whether grounds exist to rescind such agreement. . . ."[4] Following such discovery, and in light of resulting depositions lodged with it, the court in March of 1976 finally granted the petition and ordered arbitration. Along with its order, and at Graham's request, the court filed formal findings of fact and conclusions of law.[5]

By letter dated April 12, 1976, the A.F. of M. was advised of the court's order. By late June, however, no hearing date had been set and counsel for Scissor-Tail wrote to the union requesting that a date be set and suggesting certain dates convenient to him. Rather than comply with this request, however, the union, through its international executive board, on July 6 issued its decision awarding the full amount of

---

[3] It appears that in the course of discussions relating to this dispute the question of arbitration before the A.F. of M. was prominently raised by both parties. Graham, in a telegram to Forest dated August 7, 1973, indicated that unless defendants agreed to a compromise suggested by him "we will have to file charges with A.F. of M. based on Leon's breach of these four contracts."

[4] Section 1281.2 of the Code of Civil Procedure, as here relevant, provides: "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that: (a) The right to compel arbitration has been waived by the petitioner; or (b) Grounds exist for the revocation of the agreement. (c). . . ."

[5] The court made the following specific findings: "A. Scissor-Tail has not waived its right to compel arbitration; B. Plaintiff Graham did not enter into the arbitration agreements under mistake and no grounds exist for the rescission or revocation of the arbitration agreements, or any of them; and C. That all of the issues which are raised by the Complaint and First Amended Complaint of Graham, are subject to arbitration."

Scissor-Tail's claim against Graham, or some $53,000.[6] Counsel for Graham, protesting against this procedure, was informed by the A.F. of M. that it conformed with normal practice, which contemplated the entry of award without hearing. Thereupon counsel for Graham enlisted the assistance of Scissor-Tail's counsel in the matter and, upon securing the latter's consent, was successful in reopening the matter and having it set for hearing.

In the meantime, on August 10, 1976, Graham had been placed on the union's "defaulter's list"—apparently a list of persons with whom union members may not do business.

On September 10, 1976, Scissor-Tail[7] increased the claim by $20,000 to a total of some $73,000, urging that some of the expenses claimed by Graham with respect to the two concerts were improper. Scissor-Tail further requested interest on the award and $15,000 as attorney's fees.

On October 29, 1976, a hearing was held at the union's western (Hollywood) office before a "referee" appointed by the union president. The referee was a former executive officer and a long-time member of the union; he had acted as a hearing officer in many previous union matters. All parties (excluding Russell himself) and counsel were present. Graham sought to have the proceedings transcribed by a court reporter brought by him; the request was denied and the reporter excused. The hearing thereupon proceeded. Graham produced considerable evidence—consisting of his own testimony, the testimony of another promoter, the stipulated testimony of a third promoter, and three sworn statements by others engaged in the popular music concert field—to the effect that under common and widely held custom and practice in the industry, the promoter under a 90/10 or 85/15 contract was understood to bear no risk of loss because his share of the profits under such contracts was considerably smaller than under the "normal" contract, under which the promoter takes a larger percentage of the profits but is understood to bear the risk of loss; no contrary evidence was offered by Scissor-Tail. The referee also heard evidence regarding the propriety of certain expenses claimed by Graham and questioned by Scissor-Tail.

[6]This amount represented 85 percent of the net receipts from the Oakland concert less an advance by Graham to Scissor-Tail prior to the concert. (Apparently Graham had retained the net proceeds of the Oakland concert as an offset against the loss sustained in the Ontario concert.)

[7]The formal claimant before the A.F. of M. was Forest. For convenience we refer to all parties representing the Russell interests as Scissor-Tail.

On November 5, 1976, in his report to the union's international executive board, the referee recommended that Graham be ordered to pay to Scissor-Tail the amount of its original claim (some $53,000; see fn. 6, *ante*). The balance of the claim—consisting of the items added by Scissor-Tail's September 10 request—was denied, the referee noting that the union had issued no directions to him regarding it.

On February 22, 1977, the union's international executive board made its award in conformity with the recommendation of the referee.

Scissor-Tail thereupon filed a petition in the superior court to confirm the award; Graham filed a petition to vacate it. (See Code Civ. Proc., § 1285.) The court granted the former petition and denied the latter; judgment was entered accordingly. (Code Civ. Proc., § 1287.4.)[8]

After entry of judgment Scissor-Tail filed a cost bill which included an item of some $16,000 for attorney's fees. The court granted Graham's motion to tax costs, striking this item on the basis of the arbitrator's (referee's) determination.

Graham appeals from the judgment confirming the arbitrator's award. Scissor-Tail appeals from the order taxing costs.

## II

We first turn our attention to the validity of the order compelling arbitration. Plaintiff, as we have indicated, is entitled to challenge this order on the instant appeal. (See fn. 1, *ante*.)

---

[8]The court's findings of fact and conclusions of law specifically incorporated and affirmed the findings and conclusions previously filed in support of the order compelling arbitration. (See fn. 5, *ante*, and accompanying text.) The court also found, with respect to the confirmed award: "8. Said award in favor of SCISSOR-TAIL, INC. was not procured by fraud, nor corruption, nor by any other undue means; there was no corruption in the Arbitrator, and further, rights of BILL GRAHAM were not substantially prejudiced, or prejudiced at all, by any conduct of the Arbitrators; further that there was no misconduct of the Arbitrator or any bias or prejudice against BILL GRAHAM. 9. The written contracts which are the subject of this litigation and which were executed by Plaintiff, BILL GRAHAM, specifically contained a provision for arbitration; said arbitration provision clearly designated the American Federation of Musicians as the Arbitrator. Therefore, any appearance of bias, nonneutrality or lack of impartiality of the designated arbitrator was known to Plaintiff, BILL GRAHAM, at the time of the execution of the agreement containing a provision for arbitration. This finding does not infer that the Court has found or determined that said American Federation of Musi-

■ Plaintiff's basic contention in this respect is that the order compelling arbitration was in error because the underlying agreement[9]—at least insofar as it required arbitration of disputes before the A.F. of M. —was an unenforceable contract of adhesion. Two separate questions are thus presented, each of which requires separate consideration: (1) Is this a contract of adhesion? (2) If so, is it unenforceable?

### A.

The term "contract of adhesion," now long a part of our legal vocabulary,[10] has been variously defined in the cases and other legal literature.[11] The serviceable general definition first suggested by Justice Tobriner in 1961, however, has well stood the test of time and will bear little improvement: "The term signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." (*Neal* v. *State Farm Ins. Cos.* (1961) 188 Cal. App.2d 690, 694 [10 Cal.Rptr. 781].)

Such contracts are, of course, a familiar part of the modern legal landscape, in which the classical model of "free" contracting by parties of equal or near-equal bargaining strength is often found to be unresponsive to the realities brought about by increasing concentrations of economic and other power.[12] They are also an inevitable fact of life for

---

cians was biased or prejudiced or nonneutral or partial. 10. The aforesaid arbitrator did not exceed its powers and there was no mistake of law on the face of the arbitration award."

[9] As we have indicated, there are actually four agreements, or at least two, involved in this controversy. Since they are all identical in the respect we here consider, we shall sometimes hereafter refer to them in the singular.

[10] The term, apparently resting upon concepts in the French civil law, was first introduced into the common law vocabulary by Professor Patterson over 60 years ago: "Life-insurance contracts are contracts of 'adhesion.' The contract is drawn up by the insurer and the insured, who merely 'adheres' to it, has little choice as to its terms." (Patterson, *The Delivery of a Life-Insurance Policy* (1919) 33 Harv.L.Rev. 198, 222, fn. omitted.)

[11] For a representative sampling, with an emphasis on California, see cases and authorities collected in Sybert, *Adhesion Theory in California: A Suggested Redefinition and its Application to Banking* (1978) 11 Loyola L.A. L.Rev. 297, 301-305 (hereafter *Sybert*).

[12] See generally Friedmann, Law in a Changing Society (1959) chapter 4; Wilson, *Freedom of Contract and Adhesion Contracts* (1965) 14 Int. & Comp. L. 172, 172-175; Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract* (1943) 43 Colum.L.Rev. 629, 640-642 (hereafter *Kessler*).

all citizens—businessman[13] and consumer alike.[14] While not lacking in social advantages,[15] they bear within them the clear danger of oppression and overreaching. It is in the context of this tension—between social advantage in the light of modern conditions on the one hand, and the danger of oppression on the other—that courts and legislatures have sometimes acted to prevent perceived abuses.

■ We believe that the contract here in question, in light of all of the circumstances presented, may be fairly described as adhesive. Although defendant and its supporting amicus curiae are strenuous in their insistence that Graham's prominence and success in the promotion of popular music concerts afforded him considerable bargaining strength in the subject negotiations, the record before us fairly establishes that he, for all his asserted stature in the industry, was here reduced to the humble role of "adherent." It appears that all concert artists and groups of any significance or prominence are members of the A.F. of M.; that pursuant to express provision of the A.F. of M.'s constitution and bylaws members are not permitted to sign any form of contract other than that issued by the union; that the A.F. of M. form B. contract in use at the time here relevant included the arbitration provisions here in question (see fn. 2, *ante*, and accompanying text); and that Scissor-Tail insisted upon the use of 85/15 and 90/10 contractual arrangements. In these circumstances it must be concluded that Graham, whatever his asserted prominence in the industry, was required by

---

[13]Although most of the cases have arisen in the consumer context, adhesion contracts are also found in a commercial setting. (See, e.g., *Player v. Geo. M. Brewster & Son, Inc.* (1971) 18 Cal.App.3d 526 [96 Cal.Rptr. 149]; *Windsor Mills, Inc. v. Collins & Aikman Corp.* (1972) 25 Cal.App.3d 987, 995, fn. 6 [101 Cal.Rptr. 347]; see generally Domke, The Law and Practice of Commercial Arbitration (1968) § 5.04; Llewellyn, *Book Review* (1939) 52 Harv.L.Rev. 700 (hereafter *Llewellyn*). The inquiry is simply whether the requisite characteristics (e.g., inequality of bargaining power) are present.

[14]For a colorful depiction of the ubiquity of adhesive contracts in daily life, see *Wheeler v. St. Joseph Hospital, supra*, 63 Cal.App.3d 345, 378 (dis. opn. of Gardner, P. J.). For an indication of the range of circumstances in which the California cases have found contracts to be adhesive see *Sybert, supra*, at page 303.

[15]"Through advance knowledge on the part of the enterprise offering the contract that its relationship with each individual consumer or offeree will be uniform, standard and fixed, the device of form contracts introduces a degree of efficiency, simplicity, and stability. When such contracts are used widely, the savings in cost and energy can be substantial. An additional benefit is that the goods and services which are covered by these contracts are put within the reach of the general public, whose sheer size might prohibit widespread distribution if the necessary contractual relationships had to be individualized. Transactional costs, and therefore the possible prices of these goods and services, are reduced. [¶] In short, form contracts appear to be a necessary concomitant of a sophisticated, mass-consumption economy. They have social and economic utility."

the realities of his business as a concert promoter to sign A.F. of M. form contracts with *any* concert artist with whom he wished to do business—and that in the case before us he, wishing to promote the Russell concerts, was presented with the nonnegotiable option of accepting such contracts on an 85/15 or 90/10 basis or not at all.

It is argued, however, that other provisions of the contract—e.g., those relating to the length, time, and date of the concert and the selection of a special guest artist to appear on the program preceding the Russell group—were subject to negotiation and that this consideration operated to mitigate or remove all adhesive characteristics from the contract. We do not agree. Although there may be circumstances in which the parties to a contract, negotiating in the context of certain "nonnegotiable" provisions insisted upon by one of them, may yet achieve an agreement of nonadhesive character through accommodation and bargaining with respect to other significant terms, we do not believe that the instant case involves such a situation. The terms here asserted to be subject to negotiation, assuming that they were in fact so, were of relatively minor significance in comparison to those imposed by Scissor-Tail, which included not only the provision concerning the manner and rate of compensation but that dictating a union forum for the resolution of any disputes. In these circumstances we cannot conclude that the presence of other assertedly negotiable terms acted to remove the taint of adhesion.

### B.

To describe a contract as adhesive in character is not to indicate its legal effect. It is, rather, "the beginning and not the end of the analysis insofar as enforceability of its terms is concerned." (*Wheeler v. St. Joseph Hospital, supra,* 63 Cal.App.3d 345, 357.) ■■ ■■ ■ Thus, a contract of adhesion is fully enforceable according to 'its terms[16] (see *Meyers* v. *Guarantee Sav. & Loan Assn.* (1978) 79 Cal. App.3d 307, 312 [144 Cal.Rptr. 616]; *Yeng Sue Chow* v. *Levi Strauss*

---

(*Sybert, supra,* at pp. 297-298, fns. omitted; see also, e.g., *Kessler, supra,* at p. 632; *Llewellyn, supra,* at pp. 701-702.)

[16]Such terms, of course, are subject to interpretation under established principles. The rule requiring the resolution of ambiguities against the drafting party "applies with peculiar force in the case of a contract of adhesion. Here the party of superior bargaining power not only prescribes the words of the instrument but the party who subscribes to it lacks the economic strength to change such language." (*Neal v. State Farm Ins. Cos., supra,* 188 Cal.App.2d 690, 695.) In the absence of such ambiguity, however, the question of enforceability is determined wholly in light of the principles about to be discussed.

& Co. (1975) 49 Cal.App.3d 315, 325 [122 Cal.Rptr. 816]; *Schmidt v. Pacific Mut. Life Ins. Co.* (1969) 268 Cal.App.2d 735, 737 [74 Cal. Rptr. 367]; *Neal v. State Farm Ins. Cos., supra,* 188 Cal.App.2d 690, 694) unless certain other factors are present which, under established legal rules—legislative[17] or judicial—operate to render it otherwise.

██ Generally speaking, there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or "adhering" party will not be enforced against him. (See, e.g., *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 271-272 [54 Cal.Rptr. 104, 419 P.2d 168]; *Steven v. Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 869-870 [27 Cal.Rptr. 172, 377 P.2d 284]; *Wheeler v. St. Joseph Hospital, supra,* 63 Cal. App.3d 345, 357; see generally *Sybert, supra,* at pp. 305-306, and cases there cited.)[18] ██ The second—a principle of equity applicable to all contracts generally—is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or "unconscionable." (See e.g., *Steven, supra,* 58 Cal.2d at pp. 878-879; *Jacklich v. Baer* (1943) 57 Cal.App.2d 684 [135 P.2d 179].)[19] We proceed to examine whether the instant contract, and especially that provision thereof requiring the arbitration of disputes before the A.F. of M., should have been denied enforcement under either of these two principles.

---

[17]An example of legislative action is to be found in the recently enacted section 1670 of the Civil Code, which essentially renders unenforceable provisions in public-agency construction contracts appointing a party or his agent as arbitrator of disputes arising under the contract. (See also Ins. Code, § 11580.2, subd. (f).)

[18]A number of the cases, including those cited immediately above, have emphasized the aspect of notice, indicating that provisions contrary to the reasonable expectations of the "adhering" party will be denied enforcement in the absence of "plain and clear notification" and "an understanding consent." (*Steven, supra,* 58 Cal.2d at p. 883.) The effect of an adequate notice, of course, is simply to alter preexisting expectations. Notice, in other words, is simply one of the factors—albeit an extremely significant one—to be weighed in assessing the reasonable expectations of the "adhering" party. (See also *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710 [133 Cal.Rptr. 882, 552 P.2d 1178].)

Another factor which may have a profound and decisive effect on the reasonable expectations of the "adhering" party is the extent to which the contract in question may be said to be one affecting the public interest. (See *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92, 101 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693]; see generally Tobriner & Grodin, *The Individual and the Public Service Enterprise in the New Industrial State* (1967) 55 Cal.L.Rev. 1247.) The instant contract is not claimed to be—nor do we find it to be—such a contract.

[19]The judicially developed concept of unconscionability has recently become a part of our statutory law. (See Civ. Code, § 1670.5, and legis. committee com.)

■ We cannot conclude on the record before us that the contractual provision requiring arbitration of disputes before the A.F. of M. was in any way contrary to the reasonable expectations of plaintiff Graham. By his own declarations and testimony, he had been a party to literally thousands of A.F. of M. contracts containing a similar provision; indeed it appears that during the 3 years preceding the instant contracts he had promoted 15 or more concerts with Scissor-Tail, on each occasion signing a contract containing arbitration provisions similar to those here in question. It also appears that he had been involved in prior proceedings before the A.F. of M. regarding disputes with other musical groups arising under prior contracts. Finally, the discussions taking place following the Oakland concert, together with his telegram indicating that he himself would file charges with the A.F. of M. if the matter were not settled to his satisfaction (see fn. 3, *ante*), all strongly suggest an abiding awareness on his part that all disputes arising under the contracts were to be resolved by arbitration before the A.F. of M. For all of these reasons it must be concluded that the provisions requiring such arbitration (see fn. 2, *ante*, and accompanying text) were wholly consistent with Graham's reasonable expectations upon entering into the contract.

■ ■ ■ ■ We are thus brought to the question whether the contract provision requiring the arbitration of disputes *before the A.F. of M.*—because it designates an arbitrator who, by reason of its status and identity, is presumptively biased in favor of one party—is for that reason[20] to be deemed unconscionable and unenforceable. Graham, although couching his arguments in other terminology, essentially maintains that it is—the thrust of his position being that to allow the A.F. of M. to sit in judgment of a dispute arising between one of its members and a contracting nonmember is so inimical to fundamental notions of fairness as to require nonenforcement. We proceed to a consideration of this contention.

We are met at the outset of our inquiry with certain provisions of the California Arbitration Act which, it would seem, contemplate complete contractual autonomy in the choice of an arbitrator. Section 1281.6 of the Code of Civil Procedure provides that "[i]f the arbitration agreement provides a method of appointing an arbitrator, such method shall

---

[20]In addressing the plaintiff's specific contention, of course, we should not be understood to delimit the scope of the judicial concept of unconscionability. Contracts having a demonstrable public service aspect (see *Tunkl* v. *Regents of University of California, supra*, 60 Cal.2d 92), for example, may be deemed unconscionable on broad grounds of public policy.

be followed." Section 1282 of the same code states that "[*u*]*nless the arbitration agreement otherwise provides*" (italics added) arbitration shall be by a neutral arbitrator either alone or in combination with other neutral and/or nonneutral arbitrators. Subdivision (d) of the same section provides: "*If there is no neutral arbitrator*, the powers and duties of a neutral arbitrator may be exercised by a majority of the arbitrators." (Italics added.)

In *Federico v. Frick* (1970) 3 Cal.App.3d 872 [84 Cal.Rptr. 74], a case factually similar to that here before us, it was held that these provisions "expressly permit[ ] the parties to an arbitration to agree to the conduct of arbitration proceedings by a nonneutral arbitrator.... [A]rbitration being a creature of statute, the statute controls." (3 Cal. App.3d at p. 876, fn. omitted.) This result followed, the court concluded, even though "[e]lementary fairness may seem to demand that arbitration proceedings be under the control of a neutral and impartial arbitrator,..." (*Id.*) The court noted by way of footnote that "many government contracts customarily provide that all disputes arising under them shall be arbitrated by a specified official of the governmental entity which is one of the contracting parties. (See Domke, Commercial Arbitration, § 11.03, pp. 93-96.)"[21] (*Id.*, at fn. 4.)

The case of *Gear v. Webster* (1968) 258 Cal.App.2d 57 [65 Cal.Rptr. 255] reached a similar result on the same statutory grounds. It should be noted, however, that this case, concerning a dispute between a salesman and a broker, both members of the arbitrating local board of realtors, was intraorganizational in nature. *Federico* and the instant case, of course, are not.

There have been a substantial number of California cases involving the compulsion of unwilling contractual parties (both employees and customers) to arbitrate disputes with members of the New York Stock Exchange before the latter body. (See, e.g., *Richards v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1976) 64 Cal.App.3d 899 [135 Cal.Rptr. 26]; *Arrieta v. Paine, Webber, Jackson & Curtis, Inc.* (1976) 59 Cal. App.3d 322 [130 Cal.Rptr. 534]; *Vernon v. Drexel Burnham & Co.* (1975) 52 Cal.App.3d 706 [125 Cal.Rptr. 147]; *Berman v. Dean Witter & Co., Inc.* (1975) 44 Cal.App.3d 999 [119 Cal.Rptr. 130]; *Lewsadder v. Mitchum, Jones & Templeton, Inc.* (1973) 36 Cal.App.3d 255 [111

---

[21] It should be noted that the cited treatise also states: "The so-called government disputes clause has long been an issue of policy and discussion. Consideration of the propriety of such settlement machinery is beyond the consideration of this volume concerned with private commercial arbitration." (*Domke, supra*, § 11.03, at p. 94.)

Cal.Rptr. 405]; *Frame* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1971) 20 Cal.App.3d 668 [97 Cal.Rptr. 811].) All but one have ordered arbitration before that body, but only the two first cited have given explicit attention to the issue we now consider—i.e., whether potential bias said to arise from the composition of the arbitral body should preclude enforcement of a contractual provision requiring arbitration before it. Even in these cases the issue was clouded by other factors. Thus, in the *Arrieta* case the court, citing *Federico*, stated that "[p]otential unfairness from the non-neutral nature of an arbitrator is not a ground for vacation of the arbitration award," but it was noted that under the applicable arbitration rules there existed procedures for the disqualification of biased arbitrators—a factor not here present. (59 Cal.App.3d at p. 330.) In *Richards*, on the other hand, the court refused to compel arbitration on the ground, inter alia, that there was "basic apparent unfairness in requiring the nonmember to submit to arbitrators, all of whom have been appointed by the Exchange of which Merrill Lynch is a member." (64 Cal.App.3d at p. 903, fn. omitted.) It was there made clear, however, that it was this factor *in combination with others* which required the result reached.[22]

There are, of course, a host of cases from other jurisdictions which bear upon the problem. We here note only one, which we consider of particular interest. In *Matter of Cross & Brown Company* (1957) 4 App.Div.2d 501 [167 N.Y.S.2d 573], the court considered the validity of a contractual provision in an employment contract which provided that any dispute under the contract was to be arbitrated before the employer, whose decision was to be final. The court, in essence, found the provision unconscionable; enforcement was denied. "A well-recognized principle of 'natural justice,'" the court stated, "is that a man may not be a judge in his own cause. Irrespective of any proof of actual bias or prejudice, the law presumes that a party to a dispute cannot have that disinterestedness and impartiality necessary to act in a judicial or quasi-judicial capacity regarding that controversy. This absolute disqualification to act rests upon sound public policy. Any other rule would be repugnant to a proper sense of justice." (*Id.*, at p. 575.) The court went on, however, to explain the limits of its holding in the following terms: "As a general rule, since arbitration is a contractual method of settling disputes, whom the parties choose to act as an arbitrator is a matter of

---

[22]It appears that following *Richards* certain relevant changes were made in stock exchange arbitration rules and the legal requirements relating to them. (See N.Y. Stock Exch., const., art. VIII; N.Y. Stock Exch., Rules of Arbitration, rules 607 *ff.*; 15 U.S.C.A. § 78s(b).)

their own judgment. An interest in the dispute or a relationship with a party, if known to the parties to the agreement when the arbitrator is chosen, will not disqualify the arbitrator from acting. In Lipschutz v. Gutwirth, 304 N.Y. 58, 61-62, 106 N.E.2d 8, 10, the Court said: 'The spirit of the arbitration law being the fuller effectuation of contractual rights, the method for selecting arbitrators and the composition of the arbitral tribunal have been left to the contract of the parties. [¶] . . . By our decision herein we do not intend to limit the power of contracting parties to designate arbitrators who, with the knowledge of the parties, may have an interest in the dispute or who sustain some relationship to a party which would otherwise disqualify the arbitrator from serving. What we do hold is that no party to a contract, or someone so identified with the party as to be in fact, even though not in name, the party, can be designated as an arbitrator to decide disputes under it. Apart from outraging public policy, such an agreement is illusory; for while in form it provides for arbitration, in substance it yields the power to an adverse party to decide disputes under the contract." (*Id.*, at p. 576.)

▆ We believe that what was said in the *Cross & Brown* case, viewed against the provisions of our arbitration act, provides an instructive framework for the consideration of cases such as that now confronting us. The arbitration act, as we read it, expressly recognizes the right of contractual parties to provide for the resolution of contractual disputes by arbitral machinery of their own design and composition. "The policy of the law in recognizing arbitration agreements and in providing by statute for their enforcement is to encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing." (*Utah Const. Co. v. Western Pac. Ry. Co.* (1916) 174 Cal. 156, 159 [162 P. 631]; see also *Delta Lines, Inc.* v. *International Brotherhood of Teamsters* (1977) 66 Cal.App.3d 960, 965 [136 Cal.Rptr. 345]; *Vernon* v. *Drexel Burnham & Co., supra,* 52 Cal.App.3d 706, 715; *Player* v. *Geo. M. Brewster & Son, Inc., supra,* 18 Cal.App.3d 526, 534.) In so doing we do not believe—and the arbitration act does not require—that the parties are or should be strictly precluded from designating as arbitrator a person or entity who, by reason of relationship to a party or some similar factor, can be expected to adopt something other than a "neutral" stance in determining disputes. At the same time we must note that when as here the contract designating such an arbitrator is the product of circumstances suggestive of adhesion, the possibility of overreaching by the dominant party looms large; contracts concluded in such circumstances, then, must be scrutinized with particular care to insure that the party of

lesser bargaining power, in agreeing thereto, is not left in a position depriving him of any realistic and fair opportunity to prevail in a dispute under its terms.

As the United States Supreme Court has said in a related context, "Congress has put its blessing on private dispute settlement arrangements . . ., but it was anticipated, we are sure, that the contractual machinery would operate within some minimum levels of integrity." (*Hines* v. *Anchor Motor Freight* (1976) 424 U.S. 554, 571 [47 L.Ed.2d 231, 245, 96 S.Ct. 1048].) By the same token it appears that the Legislature has determined that the parties shall have considerable leeway in structuring the dispute settlement arrangements by which they are bound; while recognizing that the leeway may permit the establishment of arrangements which vary to some extent from the dead-center of "neutrality," we at the same time must insist—and most especially in circumstances smacking of adhesion—that certain "minimum levels of integrity" be achieved if the arrangement in question is to pass judicial muster.

It is for the courts of course to determine—largely on a case by case basis—what these "minimum levels of integrity" shall be. In doing so it must not be lost sight of that the "contractual machinery" of the parties is intended by them to serve as a substitute for—although of course not a duplicate of—formal judicial proceedings. What is contemplated, then, is a *tribunal*—i.e., an entity or body which "hears and decides" disputes. (See Webster's New Internat. Dict. (2d ed. 1941) p. 2707.) As the *Cross & Brown* case indicates, an entity or body which by its nature is incapable of "deciding" on the basis of what it has "heard"—as, in that case, one of the principal parties to the contract—does not qualify. "Unless we close our eyes to realities," the court there said, "the agreement here becomes, not a contract to arbitrate, but an engagement to capitulate." (167 N.Y.S.2d at p. 576.) The same result would follow, the court there suggests, when one "so identified with the party as to be in fact, even though not in name, the party" is designated. (*Id.*) In such cases as this, the agreement to *arbitrate* is essentially illusory. Here, clearly, "minimum levels of integrity" are not achieved, and the "agreement to arbitrate" should be denied enforcement on grounds of unconscionability.

There is we think a second basis, related to that just discussed, for denying enforcement on such grounds. The fact that an entity or body designated by contract to act as arbitrator of contractual disputes

is one capable of acting as a *tribunal*—i.e., in the sense of *hearing* a dispute and *deciding* fairly and rationally on the basis of what it has heard—is of little consequence if it proceeds under rules which deny a party the fair opportunity to present his side of the dispute. Thus, if a party resisting arbitration can show that the rules under which arbitration is to proceed will operate to deprive him of what we in other contexts have termed the common law right of fair procedure, the agreement to arbitrate should not be enforced. In this respect it is well to reiterate, adapting it to the present context, what we said in the seminal case on this subject. "The common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial [citation], nor adherence to a single mode of process. It may be satisfied by any one of a variety of procedures which afford a fair opportunity for [a disputant] to present his position. As such, this court should not attempt to fix a rigid procedure that must invariably be observed." (*Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 555 [116 Cal.Rptr. 245, 526 P.2d 253].) When it can be demonstrated, however, that the clear effect of the established procedure of the arbitrator will be to deny the resisting party a fair opportunity to present his position, the court should refuse to compel arbitration.[23]

 We thus return to the narrow question here before us: Is the contract we here consider, insofar as it requires the arbitration of all disputes arising thereunder before the A.F. of M., to be deemed unconscionable and unenforceable?

The answer to this question, we have concluded, must clearly be yes. Although our review of the record has disclosed nothing which would indicate that A.F. of M. procedures operate to deny any party a fair opportunity to present his position prior to decision,[24] we are of the view

[23]Enforcement of an agreement to arbitrate should be denied on this ground, we think, only in the clearest of cases, i.e., when the applicable procedures essentially preclude the possibility of a fair hearing. In all other cases the matter should be permitted to proceed to arbitration. If, in the course of arbitration proceedings, the resisting party is actually denied a fair opportunity to present his position, ample means for relief are available through a subsequent petition to vacate the award. (See Code Civ. Proc., §§ 1285.8, 1286.2, subd. (e).) (See and cf. *California State Council of Carpenters* v. *Superior Court* (1970) 11 Cal.App.3d 144, 162-163 [89 Cal.Rptr. 625].)

[24]The union's constitution and bylaws, which were before the court when it ruled on the motion to compel arbitration, provide inter alia that each party "consents to the introduction and submission of evidence to the Board in the form of unsworn written *statements, and waives the taking of oral testimony and the presentation of oral argument before the Board.*" We find nothing to indicate therein that the union member, but not the other party, has the right to an oral hearing.

that the "minimum levels of integrity" which are requisite to a contractual arrangement for the nonjudicial resolution of disputes are not achieved by an arrangement which designates the union of one of the parties as the arbitrator of disputes arising out of employment—especially when, as here, the arrangement is the product of circumstances indicative of adhesion.

As we have indicated above, drawing from the teaching of the *Cross & Brown* case, a contract which purports to designate one of the parties as the arbitrator of all disputes arising thereunder is to this extent illusory—the reason being that the party so designated will have an interest in the outcome which, in the view of the law, will render fair and reasoned decision, based on the evidence presented, a virtual impossibility. Because, as we have explained, arbitration (as a contractually structured substitute for formal judicial proceedings) contemplates just such a decision, a contractual party may not act in the capacity of arbitrator—and a contractual provision which designates him to serve in that capacity is to be denied enforcement on grounds of unconscionability. We have also indicated that the same result would follow, and for the same reasons, when the designated arbitrator is not the party himself but one whose interests are so allied with those of the party that, for all practical purposes, he is subject to the same disabilities which prevent the party himself from serving. Again, a contractual provision designating such an entity as arbitrator must be denied enforcement on the ground that it would be unconscionable to permit that entity to so serve.

A labor union is an association or combination of workers organized for the purpose of securing through united action the most favorable conditions as regards wages or rates of pay, hours, and conditions of employment for its members; the primary function of such an organization is that of bargaining with employers on behalf of its membership in order to achieve these objectives. (See cases collected at 48 Am.Jur.2d, Labor and Labor Relations, §§ 46, 48, pp. 108-111; 51 C.J.S., Labor Relations, §§ 43, 51, pp. 661-662, 672-674; 41 Cal.Jur.3d, Labor, § 1, pp. 154-155; see also Rest., Torts, § 778, p. 104; Lab. Code, §§ 1117, 1140.4, subd. (f), 1413, subd. (c).) By its very nature, therefore, a labor union addresses disputes concerning compensation arrangements between its members and third parties with interests identical to those of the affected members; to suppose that it would do otherwise is to suppose that it would act in a manner inconsistent with its reason for being.

In view of these considerations we think it must be concluded that a contractual provision designating the union of one of the parties to the contract as the arbitrator of all disputes arising thereunder—including those concerning the compensation due under the contract—does not achieve the "minimum levels of integrity" which we must demand of a contractually structured substitute for judicial proceedings. Such a provision, being inimical to the concept of arbitration as we understand it, would be denied enforcement in any circumstances; clearly it cannot stand in a case which, like that before us, requires the careful and searching scrutiny appropriate to a contract with manifestly adhesive characteristics. The trial court's order compelling arbitration in the instant case was therefore in error and must be reversed.

To the extent it is inconsistent herewith, the case of *Federico v. Frick, supra*, 3 Cal.App.3d 872, is disapproved.

### III

■ It is urged by Scissor-Tail and amicus curiae supporting it, however, that regardless of the validity of the contractual provision at issue under state law, it must be enforced as a matter of federal labor law. Their argument, as we understand it, is: (1) that the contract we here consider is, or is equivalent to, a collective bargaining agreement between Graham and the A.F. of M., each of which is involved in activities involving interstate commerce; (2) that the instant action is a dispute arising under this agreement and therefore could have been brought in federal court under section 301 of the federal Labor Management Relations Act (see 29 U.S.C.A. § 185); (3) that such an action, if brought in state court, must nevertheless be governed by federal substantive law (*Teamsters Union v. Lucas Flour Co.* (1962) 369 U.S. 95, 102-103 [7 L.Ed.2d 593, 598-599, 82 S.Ct. 571]; *Charles J. Rounds Co. v. Joint Council of Teamsters No. 42* (1971) 4 Cal.3d 888, 892 [95 Cal.Rptr. 53, 484 P.2d 1397]; *McCarroll v. L.A. County etc. Carpenters* (1957) 49 Cal.2d 45, 60 [315 P.2d 322]); and (4) that applicable federal law, as definitively declared and applied in recent federal cases, requires that the instant provision for arbitration of contractual disputes before the A.F. of M. be applied and enforced according to its terms.

While we have no reason to question the primacy of federal substantive law in areas of paramount federal concern under national labor legislation, we have considerable doubt whether the instant case may be

said to be within such an area. Moreover, and assuming that it is, we do not believe that the applicable federal law has been established or elaborated to an extent which would require us to conclude that it is contrary to our significant and uniform rule of state policy applicable to arbitration clauses generally.

Section 301 of the federal Labor Management Relations Act concerns itself with "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ...." (29 U.S.C.A. § 185(a).) We have grave doubts whether the contract we here consider may be characterized as one falling within this description. In the first place, although the contract designates Graham as the "employer" of Scissor-Tail, the circumstances under which it was solicited, executed, and carried out would seem to suggest that this designation was one of convenience rather than one describing the facts of the relationship. Secondly, and assuming that the A.F. of M. is "a labor organization representing employees in an industry affecting commerce," the A.F. of M. was not a signatory to the contract—nor did it, as such, participate in any of the negotiations preceding its execution. Indeed, the contract was not even signed by a *member* of the A.F. of M. but rather by Dennis Cordell, an officer in a corporate entity formed by a member (Russell).

It is suggested, however, that general principles of agency, which are expressly made applicable to section 301 contracts (see 29 U.S:C.A. § 185(e)), require that the union be considered a party to the instant contract. In so urging, Scissor-Tail and its supporting amicus curiae place heavy reliance on two federal district court cases, unreported in the Federal Reporter system: *Musicians, Local 336* v. *Bonatz* (D.N.J. 1974) 90 L.R.R.M. 2956, and *JOT Corp.* v. *GCS, Inc.* (E.D.Pa. 1976) 94 L.R.R.M. 2038. These cases, involving the use of the A.F. of M. form B contract, hold under their facts that the signatory musicians and union members were to be considered agents of the union for the purpose of negotiating and executing the contracts; the resulting agreements, it was held, although not collective bargaining agreements strictly speaking (see *Federation of Musicians* v. *Carroll* (1968) 391 U.S. 99, 104 [20 L.Ed.2d 460, 465, 88 S.Ct. 1562]), were nevertheless to be considered agreements "between an employer and a labor organization representing employees in an industry affecting commerce..." within the meaning of section 301. It is to be noted, however, that the contracts involved in *Bonatz* and *JOT* each bore the caption "Contract

Blank, American Federation of Musicians of the United States and Canada," the courts concluding on this basis among others that the affected "employer" should have known or expected that he was bargaining with the union through its agent-member. Even if it be assumed that *Bonatz* and *JOT* are correct on this point, it by no means follows that the instant contract, captioned with the name of the booking agency and signed by a person unaffiliated with the union, should be viewed in an identical light.

We do not, however, rest our conclusion on this narrow ground. Even if we assume this to be a contract of the type described in section 301 —and therefore to be viewed in light of federal substantive law—the question remains whether that law requires enforcement of an arbitration clause such as that we here consider. Scissor-Tail and its supporting amicus, relying primarily on the *Bonatz* and *JOT* cases, urge that the answer to that question must be yes. The insistence on union arbitration of contractual disputes, they argue, is simply one of the "economic weapons" which labor may legitimately wield in its negotiations with management. While the indicated cases may be read to lend some support to this position, we by no means consider them dispositive. In the first place, they fail to consider the illusory aspects of a provision calling for exclusive union arbitration of disputes arising in a labor context. More significantly, this court is in any event under no obligation to follow federal lower court precedents interpreting acts of Congress when we find those precedents unpersuasive. "Any rule which would require the state courts to follow in all cases the decisions of one or more lower federal courts would be undesireable, as it would have the effect of binding the state courts where neither the reasoning nor the number of federal cases is found persuasive. Such a rule would not significantly promote uniformity in federal law, for the interpretation of an act of Congress by a lower federal court does not bind other federal courts except those directly subordinate to it. [Citations.]" (*Rohr Aircraft Corp.* v. *County of San Diego* (1959) 51 Cal.2d 759, 764-765 [336 P.2d 521], revd. without comment on this point, 362 U.S. 628 [4 L.Ed.2d 1002, 80 S.Ct. 1050]; see also *People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129]; *Central Bank* v. *Superior Court* (1973) 30 Cal.App.3d 962, 967 [106 Cal.Rptr. 912]; see generally 6 Witkin, Cal. Procedure (2d ed. 1971) § 673, p. 4587.) In short, we decline to find on the basis of the *Bonatz* and *JOT* cases that the substantive federal law of collective bargaining agreements requires any result different from that which we have reached. Until that law, in its application to circumstances such as that before us, is further elaborated by

the federal courts, we assume that it does not differ significantly from our own. (See *McCarroll* v. *L.A. County etc. Carpenters, supra*, 49 Cal.2d 45, 60.) We have held today, as a matter of state law and policy, that arbitration provisions which designate as sole arbitrator either an affected contractual party or one with identical interests in the outcome of the dispute fail to achieve the level of basic integrity which we require of a contractually structured substitute for formal judicial proceedings. The fact that the instant case arises in the context of what may be considered a labor dispute should not, in our view, render this rule any the less applicable.

## IV

We have held that the provision of the instant contract requiring arbitration of disputes arising thereunder before the A.F. of M. is unconscionable and unenforceable, and that the order compelling arbitration pursuant to it was in error. In light of the strong public policy of this state in favor of resolving disputes by arbitration, however, we do not believe that the parties herein should for this reason be precluded from availing themselves of nonjudicial means of settling their differences. The parties have indeed agreed to arbitrate, but in so doing they have named as sole and exclusive arbitrator an entity which we cannot permit to serve in that broad capacity. In these circumstances we do not believe that the parties should now be precluded from attempting to agree on an arbitrator who is not subject to the disabilities we have discussed. We therefore conclude that upon remand the trial court should afford the parties a reasonable opportunity to agree on a suitable arbitrator and, failing such agreement, the court should on petition of either party appoint the arbitrator. (See and cf. Code Civ. Proc., § 1281.6.) In the absence of an agreement or petition to appoint, the court should proceed to a judicial determination of the controversy.

The judgment is reversed and the cause remanded to the trial court with directions to vacate its order compelling arbitration and undertake further proceedings in conformity with the views expressed in this opinion. Scissor-Tail's appeal from the special order after judgment taxing costs relating to attorney's fees is dismissed as moot.

Mosk, J., did not participate herein.