[Civ. No. 51111. First Dist., Div. One. May 7, 1982.]

CARPENTERS 46 NORTHERN CALIFORNIA COUNTIES CONFERENCE BOARD, Plaintiff and Respondent, v. GEORGE E. VALENTINE II, Defendant and Appellant.

**COUNSEL**

George E. Valentine II, in pro. per., and Bruce A. Lieberman for Defendant and Appellant.

David A. Rosenfeld and Van Bourg, Allen, Weinberg & Roger for Plaintiff and Respondent.

**OPINION**

**GRODIN, J.**\*—George E. Valentine II (hereinafter Valentine), appeals from an order of the San Francisco Superior Court granting the petition of Carpenters 46 Northern California Counties Conference Board (hereinafter Board) to confirm an arbitration award. Upon review of Valentine's various contentions we find no error, and affirm.

*Factual and Procedural Background*

Valentine is a general contractor licensed by the State of California. The Board is an organization comprised of affiliated local unions and district councils which represent workers employed as carpenters.

On July 30, 1974, Valentine signed a one-page document entitled "46 Counties Carpenters Memorandum Agreement" in which he agreed "to comply with the wages, hours and working conditions as set forth in that certain agreement referred to for convenience as the Carpenters 46 Northern California Counties Master Agreement dated June 16, 1974 and terminating June 15, 1977 . . . and any modifications, changes, extensions or renewals of or to said Master Agreements which may be

---

\*Assigned by the Chairperson of the Judicial Council.

negotiated by the parties thereto for the term thereof." The 1974-1977 master agreement was extended, with modifications, for a period of three years from 1977 to 1980. The terms of the two agreements, insofar as they are relevant to decision of this matter, are identical.

Section 51 of the master agreement provides for a grievance and arbitration procedure applicable to "[a]ny dispute concerning any application or interpretations of this Agreement." Under that procedure, disputes not satisfactorily adjusted between the union and the individual employer are to be submitted to a board of adjustment composed of two members named by the union, two by the Homebuilders Association (which is the principal party to the master agreement) and an impartial arbitrator. The agreement provides: "Decisions of the Board of Adjustment or an Impartial Arbitrator shall be within the scope and terms of this Agreement and shall be final and binding upon all parties hereto."

In 1977 Valentine, according to his declaration in the instant matter, stopped employing union labor, and stopped making contributions to the union's various trust funds. Sometime in November 1978 he received a copy of a grievance initiated by the union, which he characterized as being "for refusing to hire union carpenters and not making payments to the union's trust funds." Because he did not believe he was obligated to the union, Valentine, according to his declaration, ignored the grievance.

On February 23, 1979, Paul Cassady, permanent impartial arbitrator under the master agreement, rendered an "Arbitration Decision and Award." The arbitrator's opinion reflects that a hearing was held on January 24, 1979, and that there was no appearance by the Homebuilders Association or by Valentine. The opinion states that various exhibits were introduced, including a "[c]opy of the Memorandum Agreement" signed by Valentine, a "[c]opy of the grievance dated November 7, 1978," a "[c]opy of letter sent to last known address of the Employer advising Employer of the time and date of this proceeding," and "[p]roof of service by mail dated January 4, 1979"; and that Jim O'Sullivan, business representative of Carpenters Local Union No. 22, testified as to the merits of the grievance.

Based upon the evidence submitted, the arbitrator found that Valentine "is party to and bound to the current Master Agreement," and that Valentine "failed to appear, although it was given notice of these pro-

ceedings and was advised by said notice of its right to be heard." The arbitrator also found that the grievance was meritorious, and issued an award requiring Valentine (1) to cease and desist any further violations of the agreement, and (2) to submit to an audit of its books and records to determine amounts, if any, which might be due for wages and fringe benefits. The arbitrator retained jurisdiction to resolve any dispute which might arise concerning the amounts of back pay and benefits. In accordance with the terms of the master agreement, the arbitrator ordered Valentine to pay reasonable court costs and attorneys' fees incurred in enforcing the award, if Valentine failed to comply, and to pay the sum of $75 for his share of the cost of the arbitration proceeding.

On April 23, 1979, the Board filed a petition to confirm arbitrator Cassady's award. The only evidence introduced in the confirmation proceedings, apart from the relevant documents and the award, was a declaration from Valentine which makes the following assertions: (1) that he signed the memorandum agreement without reading it, and without negotiation, because he was told by an unidentified union representative that he had to do so in order to employ union carpenters; (2) that although the memorandum agreement contained an acknowledgement that he had received copies of the master agreement and relevant trust agreements, in fact no such documents were received by him; (3) that "[a]s far as was made known to [him] by the union representative, [his] only obligations were to pay union wages and make contributions to the union trust funds *so long as* [he] employed union labor"; (4) that when he stopped employing union labor and stopped making contributions to the trust funds "some of [the union's] members began picketing [his] job site; and a few of them engaged in acts of violence against [his] machinery, [his] tools, some of [his] employees and [himself]"; (5) that when he received the notice of grievance in November 1978 he ignored it because he "concluded that the purported grievance simply was the most recent example of the union's harassment of [his] business, and, upon the advice of [his] attorney"; and (6) that he was served on March 9, 1979, with the petition for confirmation of the arbitrator's award. The declaration does not make reference to the letter referenced in the arbitrator's decision, advising him of the time and date of the arbitration proceeding.

Based upon this evidence, and upon memoranda and oral argument, the trial court, on June 25, 1980, entered an order granting the petition to confirm and awarding costs to the Board. This appeal followed.

*Discussion*

Valentine makes several arguments, which we will consider in the order most convenient for analysis.

*First*, he contends that as a matter of law he was not bound by the automatic renewal provision of the master agreement because the memorandum of agreement which he signed was a contract of adhesion, and the automatic renewal provision contained in the master agreement was both unknown to him and contrary to his reasonable expectations.

There exists a threshold question as to what law governs determination of this issue. The Board asserts that it is federal law "[s]ince this dispute concerns a Collective Bargaining Agreement which affects interstate commerce." The reference is to section 301(a) of the Labor Management Relations Act (29 U.S.C. § 185(a)), which pertains to suits for violations of contracts "between an employer and a labor organization representing employees in an industry affecting commerce." The United States Supreme Court has held that Congress intended to create a body of federal substantive law applicable to suits under section 301(a) (*Textile Workers* v. *Lincoln Mills* (1957) 353 U.S. 448 [1 L.Ed.2d 972, 77 S.Ct. 912]), and that while state courts share concurrent jurisdiction over such suits, federal law remains applicable and "incompatible doctrines of local law must give way." (*Teamsters Local* v. *Lucas Flour Co.* (1962) 369 U.S. 95, 102 [7 L.Ed.2d 593, 598, 82 S.Ct. 571]; see also, *Northern Cal. Dist. Council of Hod Carriers* v. *Pennsylvania Pipeline, Inc.* (1980) 103 Cal.App.3d 163, 171 [162 Cal.Rptr. 851], cert. den. (1980) 449 U.S. 874 [66 L.Ed.2d 95, 101 S.Ct. 216].)

It is not at all clear that the contract which Valentine signed is subject to section 301(a). The record contains no evidence pertaining to the size of his business operations or their impact upon interstate commerce. The petition to confirm the arbitration award alleges that Valentine "is an employer pursuant to the meaning of the National Labor Relations Act," and that allegation is not denied in the response; but the term "employer" is defined in the federal statute in terms which make no reference to interstate commerce. (29 U.S.C. § 152(2).) And, assuming arguendo that the contract could fall within the ambit of section 301 by virtue of the Board's contractual relationships with employers under the master agreement, the record is barren of evidence concerning the interstate aspects of those relationships as well.

We find it unnecessary to decide that question, however, since we find no incompatibility between federal and state principles as applied to this case. ■ *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807 [171 Cal.Rptr. 604, 623 P.2d 165], provides a framework for analysis. In that case, the Supreme Court reiterated established state law that a contract of adhesion—"a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or re-ject it" (*id.,* at p. 817)—is "fully enforceable according to its terms [citations] unless certain other factors are present which, under estab-lished legal rules—legislative or judicial—operate to render it otherwise. [¶] Generally speaking, there are two judicially imposed limi-tations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him. [Citations.] The second—a principle of equity applicable to all contracts generally—is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.'" (*Id.,* at pp. 819-820.) The court in *Graham* found that a contract entered into between a promoter of musical concerts and performers on a form supplied by the musicians union was a contract of adhesion because the promoter was "required by the realities of his business ... to sign A.F. of M. form contracts with *any* concert artist with whom he wished to do business" (28 Cal.3d at pp. 818-819), and that the contract was unconscionable because it called for arbitration of disputes by the executive board of the union, which represented one of the parties to the contract.

*Graham* did not involve a collective bargaining relationship per se, and the court expressed "grave doubts" whether the contract in that case fell within the ambit of section 301. (28 Cal.3d at p. 829.) Indeed, we are aware of no cases which have applied the adhesion doctrine to true collective bargaining agreements which, it has been observed, "are not 'ordinary contracts' and are not 'governed by the same old common-law concepts which control such private contracts,' but are 'unique in character and a field unto themselves.'" (*Pio v. Kelly* (1976) 275 Ore. 585 [552 P.2d 1301, 1306].) Assuming, however, that the doctrine is applicable (cf. *Graham v. Scissor-Tail, Inc., supra,* 28 Cal.3d at pp. 829-830), its application does not render unenforceable the contract between these parties.

Valentine does not contend, nor could he credibly do so, on these facts, that the provision for automatic renewal was unconscionable. The master agreement provided a means by which he could have terminated the contractual relationship at the end of the first three-year period, and he failed to avail himself of that procedure. And, unlike the situation in *Graham*, the contract called for arbitration by a neutral arbitrator not linked to either of the parties. (*Painters Dist. Council No. 33 v. Moen* (1981) 128 Cal.App.3d 1032 [181 Cal.Rptr. 17].)

Valentine's sole contention in this regard is that the provision for automatic renewal was contrary to his reasonable expectations. He submits no evidence in support of that contention, other than his asserted ignorance of the renewal provision and his rather oblique statement that "[a]s far as was made known to [him]" by an unidentified union representative his obligations continued only so long as he employed union labor.

Provisions for automatic renewal are commonplace in the construction industry, and they have been frequently enforced by the National Labor Relations Board and courts. (E.g., *Ted Hicks and Associates, Inc. v. N. L. R. B.* (5th Cir. 1978) 572 F.2d 1024; *N. L. R. B. v. R. J. Smith Const. Co., Inc.* (D.C. Cir. 1976) 545 F.2d 187; *Bugher v. Southland Fabricators & Erectors, Inc.* (W.D.La. 1978) 452 F.Supp. 870; *Sheriff v. Medel Elec. Co.* (D.C.App. 1980) 412 A.2d 38; *Pio v. Kelly, supra,* 552 P.2d 1301.)

While Valentine claims he was not furnished a copy of the master agreement, he makes no claim that he ever asked for one, or that it would have been difficult to obtain a copy if he had asked, and he admits that he complied with its terms, and took advantage of the union's obligations under it, for several years. Moreover, a union contract which gave the employer an option to avoid its coverage by employing "non-union" labor would be an odd contract indeed. The master agreement provided no such option; it required Valentine to obtain his workers through the union's referral system, and to provide stipulated wages and fringe benefits to all workers he employed. Thus, the record does not support Valentine's contention that the provision for automatic renewal was contrary to his reasonable expectations as a matter of law.

*Second*, Valentine contends that he "abandoned" the contract in 1977, and that the union "acknowledged" the abandonment by its acts of picketing and alleged (but unidentified) violence and by failing to

utilize the contractual enforcement procedures for more than a year. He cites no authority for the proposition that a union "abandons" its rights under an agreement by such conduct, and the issue raised, in any event, is one within the province of the arbitrator to determine. (See, *Auto, Marine & Specialty Painters* v. *Bay Area, etc.* (9th Cir. 1978) 577 F.2d 609.)

*Third*, Valentine contends that the union failed to comply with contractual procedures which require that grievances be called to the attention of the employer "within thirty (30) days after the last date the alleged violation was committed." ■ Whether or to what extent failure to comply with such contractual time limits bars arbitration, however, is an issue for the arbitrator to decide. (*John Wiley & Sons* v. *Livingston* (1964) 376 U.S. 543 [11 L.Ed.2d 898, 84 S.Ct. 909]; *Napa Association of Public Employees* v. *County of Napa* (1979) 98 Cal. App.3d 263 [159 Cal.Rptr. 522].) In this case, even if the contractual time limit had been asserted in arbitration, the arbitrator could have found that the employer's violation was a continuing one. While we intend to express no view as to the merits, we note that the arbitrator has reserved jurisdiction over disputes as to the amounts owed, and that the terms of the award do not foreclose consideration of the contractual time limit in determining such a dispute.

*Fourth*, Valentine complains there is no evidence that the dispute was submitted to the bipartisan board of adjustment, or that the board of adjustment reached a deadlock, before the dispute was submitted to the impartial arbitrator. That is true. In fact, the record contains no direct evidence of the procedure that was followed. The arbitrator's opinion simply states: "The Individual Employer having failed to appear, the matter was submitted to Paul Cassady, permanent neutral arbitrator for decision." If, as the attorney for respondent Board represents, it was the practice of the parties that when an individual employer fails to appear for a board of adjustment hearing then the board automatically declares a deadlock and the matter is submitted directly to the impartial arbitrator for decision, it would be wise for the parties to codify that practice in the agreement. ■ Whether preliminary procedures had been complied with, or the effect of noncompliance would, however, have been an issue for the arbitrator. "Doubt whether grievance procedures ... have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration." (*John Wiley & Sons* v. *Livingston, supra,*

376 U.S. 543, 557 [11 L.Ed.2d 898, 908-909]; see also *Butchers Union v. Farmers Markets* (1977) 67 Cal.App.3d 905, 911 [136 Cal.Rptr. 894].) No case law we are aware of suggests that the bypassing of a step in the grievance process is fatal to the arbitrator's jurisdiction. Since Valentine could have raised this contention before the arbitrator, and did not, he must be deemed to have waived it.

*Finally*, Valentine contends that "as a matter of equity, the arbitration award cannot be confirmed." This contention is based upon the individual contentions we have discussed, viewed collectively. We have found none of them to have merit on an individual basis, and we find no greater merit when we look at them together.

Affirmed.

Racanelli, P. J., and Goff, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.