Opinion
 

 VOGEL (Miriam A.), J.
 

 Barry J. Spinello sued Amblin Entertainment, Universal City Studios, Inc., and Steven Spielberg for damages, alleging they had appropriated his ideas and were using them for a new movie. Relying on a written agreement which included an arbitration clause, the defendants moved to compel arbitration. The motion was denied and the defendants appeal. We reverse and remand with directions to grant the motion.
 

 Background
 

 In April 1988, Spinello (a self-described motion picture producer, writer and director with more than 20 years’ experience in “the industry”) discussed his script, “Adrian and the Toy People,” with Deborah Jelin Newmyer, an Amblin executive. Newmyer told Spinello he could have his agent
 
 *1393
 
 submit the script and, in November 1988, Spinello’s agent mailed a copy to Newmyer. By that time, Newmyer was away on maternity leave and the script was reviewed by another executive, Bettina Viviano. By letter dated January 9, 1989, Viviano returned the script to Spinello, explaining Amblin wasn’t interested in it.
 
 [1]
 

 In early 1990, Spinello met Alan Davio, one of Spielberg’s cameramen. Spinello told Davio about “Adrian and the Toy People” and showed Davio some photographs he had used to illustrate animated portions of his script. From Davio’s “body language” and “face,” Spinello concluded that (a) Davio liked the photographs and (b) Davio thought Spielberg would be interested in seeing the photographs.
 

 Thus encouraged, on February 6, 1990, Spinello submitted his script to Spielberg at Amblin, explaining in a cover letter that Davio “thought you might be interested in seeing [my] photos” but neglecting to mention that Amblin had previously rejected Ids script. The script was referred to Newmyer (who had returned from maternity leave) and Newmyer, in turn, wrote to Spinello, explaining that Amblin would review his script only if he signed and returned Amblin’s standard submission agreement.
 

 Spinello did not talk to Newmyer or anyone else at Amblin. Instead, he contacted his literary agent, Barry Salomon, and discussed the submission agreement with him (and may have sent him a copy). Salomon told Spinello to sign the agreement, which he said was “standard,” and to submit the script. On March 20,1990, Spinello signed and dated the agreement and, on March 26, sent it to Amblin with a copy of his script.
 
 [2]
 
 It is this agreement which contains the arbitration clause.
 
 [3]
 

 
 *1394
 
 By letter dated April 24, 1990, Newmyer returned Spinello’s script, rejecting it on behalf of Amblin.
 
 [4]
 
 Both before and after his two submissions to Amblin, Spinello submitted copies of the same script to about seventy other studios and producers.
 

 In April 1992, Daily Variety announced that Amblin and Universal had purchased a script from Gavin Scott, a British screenwriter, entitled “Small Soldiers,” a “fantasy adventure about a young boy’s escapades with an army of toy soldiers who come to life.” Based solely on this article, Spinello concluded “Small Soldiers” was based on his idea. He therefore sued Amblin, Spielberg and Universal in the Los Angeles Superior Court, alleging breach of contract and a variety of tort theories (intentional interference with prospective economic advantage, conversion, breach of an implied covenant of good faith and fair dealing, breach of confidence and fraud), all based on the same claim—that the defendants had unlawfully used “Spinello’s novel script and ideas for a possible major motion picture.”
 
 [5]
 

 
 *1395
 
 In October 1992, Amblin removed the action to federal district court, contending the conversion claim was a disguised copyright infringement action over which the federal court had exclusive jurisdiction. Upon arrival in federal court, Amblin moved to compel arbitration. The federal district court denied the motion without prejudice and, in February 1993, dismissed the conversion claim and remanded the action back to the Los Angeles Superior Court.
 

 Amblin answered and moved to compel arbitration. The trial court denied the motion, finding the arbitration clause was both “procedurally and substantively unconscionable” and thus unenforceable. Amblin, Spielberg and Universal (henceforth referred to collectively as Amblin) appeal.
 

 Discussion
 

 I.
 

 First, we hold that the rules of “procedural and substantive unconscionability” relied on by the trial court have nothing to do with the enforcement of an agreement to arbitrate.
 

 In support of its finding of unconscionability, the trial court relied on
 
 Dean Witter Reynolds, Inc.
 
 v.
 
 Superior Court
 
 (1989) 211 Cal.App.3d 758, 766-769 [259 Cal.Rptr. 789], a class action which challenged the fees charged by Dean Witter for its self-directed individual retirement accounts. The issue in
 
 Dean Witter
 
 was the propriety of the class certification order, not the enforceability of an agreement to arbitrate—Dean Witter claimed that, to the extent the plaintiffs claims rested on the unconscionability of the fees charged by Dean Witter, the claims lacked merit because the plaintiff could have gone to a competing financial service and opened an IRA without charge. Since lack of merit is a ground for denying class action treatment under the Consumers Legal Remedies Act (Civ. Code, § 1781, subd. (c)(3)), it was necessary for the court to determine whether the fee provision was unconscionable. As the court framed the issue, it was “whether the availability of alternative products in the market, in circumstances such as these, demonstrates that any claim based on unconscionability lacks merit.”
 
 (Dean Witter Reynolds, Inc.
 
 v.
 
 Superior Court, supra,
 
 211 Cal.App.3d at p. 767.)
 

 
 *1396
 
 It was in that context, and only that context, that the
 
 Dean Witter
 
 court discussed unconscionability.
 
 [6]
 
 We have searched for a case applying the
 
 Dean Witter
 
 rules to an arbitration provision (no such case has been cited by the parties) and have not been able to find anything even touching on the issue—perhaps because there is no reason in law or logic to ignore the entire body of statutory and case law governing the interpretation of agreements to arbitrate in order to apply rules developed in a different and distinguishable context.
 

 II.
 

 These are the rules the trial court should have applied.
 
 [7]
 

 In
 
 Madden
 
 v.
 
 Kaiser Foundation Hospitals
 
 (1976) 17 Cal.3d 699 [131 Cal.Rptr. 882, 552 P.2d 1178], the issue before the Supreme Court was whether an arbitration clause included in a state employee’s health plan was enforceable when the employee sued for damages for medical malpractice. In that context, the court held the principles governing contracts of adhesion did
 
 not
 
 bar enforcement of the arbitration clause—because the terms of the health plan represented the product of negotiation between two parties, the health plan on the one hand and the Board of Administration of the State Employees Retirement System on the other.
 
 (Id.
 
 at pp. 710-711.) As the Supreme Court explained:
 

 “In many cases of adhesion contracts, the weaker party lacks not only the
 
 opportunity to bargain
 
 but also any realistic
 
 opportunity to look elsewhere
 
 for
 
 *1397
 
 a more favorable contract; he must either adhere to the standardized agreement or forego the needed service. . . . [][] [And] in
 
 all
 
 prior contract of adhesion cases, the courts have concerned themselves with weighted contractual provisions which served to limit the obligations or liability of the stronger party.
 
 The arbitration [clause], by way of contrast, bears equally on Kaiser and the members.
 
 It does not detract from Kaiser’s duty to use reasonable care in treating patients, nor limit its liability for breach of this duty, but merely substitutes one forum for another.[
 
 8
 
 ]
 

 “Although plaintiff asserts that the arbitration [clause] promotes Kaiser’s interest to the disadvantage of the members enrolled under the Kaiser plan, she overlooks the benefits of the arbitral forum. The speed and economy of arbitration, in contrast to the expense and delay of jury trial, could prove helpful to all parties; the simplified procedures and relaxed rules of evidence in arbitration may aid an injured plaintiff in presenting his case. . . .”
 
 (Madden
 
 v.
 
 Kaiser Foundation Hospitals, supra,
 
 17 Cal.3d at p. 711, italics added; see also
 
 Moncharsh
 
 v.
 
 Heily & Blase
 
 (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899] [the policy of the law is to encourage enforcement of arbitration agreements].)
 
 [9]
 

 Accordingly, the appropriate question in this case is whether the agreement between Spinello and Amblin was a contract of adhesion. Clearly, it was not. Spinello had the opportunity to negotiate and simply failed to do so. When the agreement was submitted to him, he could have asked his agent to request deletion or modification or limitation of the arbitration provision, or he could have done so himself. As he admits, however, he did not do so. Spinello was not a novice—he had about 20 years’ experience in the entertainment industry and he was represented by a literary agent. If we accept as true Spinello’s statement that he understood the cameraman’s response to suggest Amblin would be interested, it follows logically that Spinello believed he had a valuable property and, therefore, a basis for negotiation.
 

 And as Spinello also admits, he had the opportunity to go elsewhere and, in fact, did so—he submitted his script to approximately 70 other producers
 
 *1398
 
 (at least several of whom did
 
 not
 
 require execution of submission agreements) —a consideration which shows that this was not an adhesion contract under
 
 Madden
 
 or, if the rule applied, an unconscionable contract under
 
 Dean Witter.
 

 III.
 

 In defense of the trial court’s order, Spinello contends Amblin’s failure to require execution of a submission agreement the first time the script was submitted means there is no arbitration provision covering Amblin’s initial review of Spinello’s script and that, since it cannot now be determined when Amblin stole his ideas, none of Spinello’s claims are subject to the arbitration clause. We disagree.
 

 At the time of the second submission (1990), Spinello (who obviously knew he had submitted the same script to Amblin in 1988) agreed that “any dispute” arising out of the agreement, specifically including Amblin’s determination that it had the right to use material containing features or elements similar or identical to those contained in Spinello’s script, would be submitted to arbitration and that, except as so provided, Spinello released Amblin from any and all claims that might arise in relation to the submitted material. By signing this agreement, Spinello clearly and unequivocally agreed to arbitrate
 
 all
 
 disputes about this script, without limitation to the 1990 submission.
 

 Moreover, the Amblin executive Spinello dealt with in 1990 (Newmyer) was not the same person he dealt with in 1988 (Viviano). Spinello nevertheless failed to mention that the 1988 review had been pursued by Viviano without a submission agreement, an omission which weighs heavily against Spinello’s current effort to avoid his agreement by reliance on the earlier submission. In our view, his signature on the 1990 agreement was tantamount to a waiver of any different rights he might have had based on the unconditional acceptance of the script in 1988.
 

 Finally, no inequity results from this interpretation. As mentioned in the submission agreement and noted by experts in the field, “[m]otion picture production companies, agents and others in the entertainment industry receive vast numbers of stories, treatments, screenplays and so forth for consideration for development. Out of a tremendous volume of materials, a relatively few projects are selected for development and even fewer are ultimately produced. There are serious concerns for the recipients in accepting unsolicited (and even solicited) material, in particular regarding the originality and ownership of the material, as well as regarding potential
 
 *1399
 
 copying claims, especially if it should turn out that the production company has a similar project of its own already in development. For these reasons, production companies will usually refuse to accept material unless it is represented by an agent. Even when material is accepted, either directly or through an agent, production companies may require the owner to sign a submission release to provide certain protections for the production company.” (Kenoff & Rosenberg, Entertainment Industry Contracts: Negotiating and Drafting Guide (1994) § 2.02, pp. 2-3.) Under these circumstances, the arbitration agreement (and our interpretation of it to cover both submissions) is patently fair to all parties.
 
 [10]
 

 Disposition
 

 The order is reversed and the matter is remanded to the trial court with directions to grant Amblin’s motion to compel arbitration of all claims raised by Spinello. Amblin is awarded its costs of appeal.
 

 Spencer, P. J., and Ortega, J., concurred.
 

 [1]
 

 More specifically, what she said was that “Adrian is a strong-willed, sensitive character, but Tony seems like a stereotypical ‘mean dad,’ and Jack, who has the promise of being an interesting character, dies before he is fully explored. [J] A problem with the story is that many of the magical elements, particularly the storyline with the haunted barn, are never explained. [1] Though this doesn’t seem right for Amblin at this time, thank you for sharing it with us, and best of luck in the future.”
 

 [2]
 

 Spinello’s cover letter states: “Enclosed is Adrian and the Toy People and the signed release form you requested. [1] I am seeking to make a two minute screentest, using live insects from around the world, battling toy soldiers, that will cause the enclosed photographs to come alive. [1] The way the toys fit the story is clear in the script. [1] Please see the unique vision in this, and recommend [it] to Steven Spielberg. I would appreciate the opportunity to describe the several years research spent on this.” In a postscript, Spinello added: “[F]or your interest, I was nominated for an Academy Award for the film: A Day in the Life of Bonnie Consolo, which Mike Wallace featured on 60 Minutes, three times. It’s one of the most successful short films of all time.”
 

 [3]
 

 The two-and-one-half-page submission agreement provided, among other things, that Spinello “recognize[d] the possibility that the submitted material may be identical with or
 
 *1394
 
 similar to material that has or may come to [Amblin] from other sources. Such similarity in the past has given rise to litigation so that unless [Amblin] can obtain adequate protection in advance, [Amblin] will refuse to consider the submitted material. . . .
 

 “3. If there is any dispute arising out of this Agreement, including the substance, validity, operation or breach hereof (including but not limited to: if [Amblin] should determine that [it has] the independent legal right to use material containing features or elements similar or identical to those contained in the submitted material without entering into a written agreement for compensation to [Spinello], and if [Amblin] proceed[s] to use the same and if [Spinello] disagree[s] with [Amblin’s] determination), the dispute between us shall be submitted to arbitration in Los Angeles, California, before an arbiter mutually selected by us who is experienced in the field with respect to the use of material similar to the submitted material; or, if we cannot mutually agree, then such arbiter shall be selected in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitration shall be controlled by the terms of this agreement, and any award favorable to [Spinello] shall be limited to the fixing of compensation for [Amblin’s] use of the submitted material, which shall bear a reasonable relation to compensation for [Amblin’s] use of the similar material. Such award will provide for [Amblin] and [Spinello], each respectively, to bear his own costs of arbitration and attorneys’ fees. . . .
 

 “6. Except as otherwise provided in this agreement, [Spinello] hereby release[s Amblin] of and from any and all claims, demands, liabilities of every kind whatsoever, known or unknown, that may arise in relation to the submitted material or by reason of any claim now or hereafter made by [Spinello] that [Amblin has] used or appropriated the submitted material, except for fraud or willful injury on [Amblin’s] part. . . .”
 

 [4]
 

 In her letter, Newmyer thanked Spinello for the opportunity to review the script and explained that “[t]he idea of a young boy who saves his family farm with the help of animated toy figurines is an imaginative one, and Adrian is a charming young dreamer whose intentions are admirable. However, the animated sequences don’t seem well enough integrated into the plot, for this difficult meshing to come alive. . . .” When juxtaposed with comments by others to whom Spinello’s script was submitted, Newmyer’s rejection was unquestionably kind.
 

 [5]
 

 The lawsuit was preceded by a letter from Spinello to Spielberg dated April 30: “I’m delighted to know you are going forward with my idea and story about a young boy’s
 
 *1395
 
 adventures with an army of toy soldiers who come to life. Pf] As you probably are aware from Barbara Viviano’s letter to me of 1/9/89, and Deborah Newmyer’s closer look at my script, and her subsequent letter to me of 4/24/90, I understand that you at Amblin feel my story needs to be modified to integrate the animated sequences more thoroughly into the plot. I, of course, being the author have ideas on just how to do that [1] Looking forward to being of further assistance as soon as we can come to terms.”
 

 [6]
 

 Dean Witter
 
 holds that the doctrine of unconscionability presents both procedural and substantive aspects.
 
 Procedural unconscionability
 
 exists where there is oppression (an inequality of bargaining power resulting from the absence of meaningful choice or the inability to negotiate) or surprise (the terms of the bargain are hidden in a prolix printed form). A claim of oppression may be defeated if the complaining party had reasonably available alternative sources of supply from which to obtain the desired goods or services free of the terms claimed to be unconscionable.
 
 Substantive unconscionability
 
 exists where there is an allocation of risks or costs which is one-sided and not justified by the circumstances in which the contract was made. Although both procedural and substantive unconscionability must be present before a contract will be deemed unenforceable, a relatively larger degree of one will compensate for a relatively smaller degree of the other.
 
 (Dean Witter Reynolds, Inc.
 
 v.
 
 Superior Court, supra,
 
 211 Cal.App.3d at pp. 767-768.)
 

 [7]
 

 Where, as here, the relevant facts are undisputed, the question before us is one of law, which we may decide de novo.
 
 (Stratton
 
 v.
 
 First Nat. Life Ins. Co.
 
 (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721].) Very little evidence of any kind was presented below, and certainly none that would create a conflict. There is Spinello’s declaration, which recites the facts set forth at the beginning of this opinion, and there are copies of the various letters referred to above. There is also a declaration from Spinello’s lawyer, but all it contains is argument, not evidence. To the extent Spinello’s declaration suggests he actually read the submission agreement before signing it, that assertion is flatly contradicted by his earlier (and controlling) deposition testimony that he had signed it without reading it.
 
 (D’Amico
 
 v.
 
 Board of Medical Examiners
 
 (1974) 11 Cal.3d 1, 21 [112 Cal.Rptr. 786, 520 P.2d 10].)
 

 [8]
 

 Of course, the provision in
 
 Dean Witter
 
 was weighted entirely in favor of the institution and against its customer.
 

 [9]
 

 In
 
 Graham
 
 v.
 
 Scissor-Tail, Inc.
 
 (1981) 28 Cal.3d 807, 820-821 [171 Cal.Rptr. 604, 623 P.2d 165], the Supreme Court observed that a contract of adhesion is fully enforceable according to its terms
 
 unless
 
 certain other factors operate to render it otherwise. A finding of undue oppression or unconscionability may be such a factor—but “unconscionability” in the arbitration context is something which denies “minimum levels of integrity” to the process.
 
 (Id.
 
 at pp. 826-827.) “Unconscionability," as used in
 
 Graham,
 
 thus differs substantially from the meaning given to that term in the nonarbitration cases (such as
 
 Dean Witter).
 

 [10]
 

 We summarily reject Spinello’s contention that his fraud allegations raise issues about fraud in the inducement of the agreement. At the hearing on the motion to compel arbitration, the trial court found insufficient evidence of fraud in the inception of the agreement and denied the motion to compel solely on the basis of its erroneous unconscionability findings. Assuming that Spinello has standing to address this finding on Amblin’s appeal, the attack is entirely without merit—Spinello points to no evidence at all of fraud in the inception (or any fraud at all) and our review of the record reveals no such evidence. To the extent the complaint alleges fraud by Amblin, those claims are no more than a rehash of the claim that Amblin misrepresented its rejection of Spinello’s script (because it was actually developing his ideas). As alleged, that is not fraud in the inducement.
 
 (Lynch
 
 v.
 
 Cruttenden & Co.
 
 (1993) 18 Cal.App.4th 802 [22 Cal.Rptr.2d 636].)