Filed 2/10/22  Tamanaha v. DroneBase CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ELI TAMANAHA, | B307866 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC705004) |
| v. | |
| DRONEBASE, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lia Martin, Judge.  Affirmed.

Miller Barondess, Christopher D. Beatty and Minh-Van T. Do for Plaintiff and Appellant.

Prospera Law, Victor T. Fu and Shane W. Tseng for Defendants and Respondents.

——————————————

Plaintiff/appellant Eli Tamanaha (plaintiff) appeals from a judgment confirming an arbitration award in favor of defendants/respondents Daniel Burton (Burton) and DroneBase Inc. (DroneBase; collectively, defendants). Plaintiff contends the trial court erred in entering judgment on the arbitration award because his claims were not covered by the parties' arbitration agreement, the arbitration agreement was substantively and procedurally unconscionable, and the arbitrator exceeded his authority by excluding plaintiff from portions of the arbitration hearing. We conclude that while the arbitration agreement was substantively unconscionable, it was not procedurally unconscionable, and its broad language encompassed plaintiff's claims. We further conclude that plaintiff's exclusion from a small portion of the hearing, even if erroneous, was not prejudicial. We therefore will affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

*A.     Backgound*

Plaintiff is an electrical engineer with 15 years of experience working as a senior software engineer at large technology companies such as Amazon, Netflix, and Microsoft. Plaintiff left Microsoft in 2014, and thereafter received offers from several large technology companies, including Google and Roku. In August 2014,[1] a mutual friend introduced plaintiff to Burton, who had recently founded DroneBase, a drone services company. Plaintiff and Burton thereafter discussed the possibility of plaintiff joining DroneBase to design and build its technical systems, including its website, server, and apps.

---

[1]     All dates are in 2014 unless otherwise indicated.

In a series of meetings and emails in September and October, plaintiff and Burton discussed plaintiff's potential compensation, including his salary and equity in the company. On September 17, Burton proposed meeting in-person to "go over the details" so plaintiff could "walk away confident that you can indeed support your family." Plaintiff and Burton apparently met a few days later, after which Burton emailed plaintiff that there was "[n]o rush on the information we discussed today, and I look forward to discussing that and other steps forward next Monday." Several days later, plaintiff emailed Burton that he "like[d] the direction we're headed in" and was "about to reject Google and Roku's offers that are currently on the table." Plaintiff asked what Burton's salary expectations were, noting that he would need to earn at least $200,000 a year to meet his current expenses, but was "willing to live off of savings for a while if necessary." The following day, Burton responded that he was open to a "detailed discussion around finances, investors, salary and equity" so plaintiff could feel "happy and confident in the path forward" before turning down other job offers.

After a September 29 meeting, Burton emailed that he was glad to have had "an honest, if a bit tough, conversation today" and set out his thoughts regarding "the salary versus equity split." Burton followed up on October 2 that "we need to find the balance of equity versus salary for you," and proposed "either $95k salary with 40% founder's equity or $125k salary with 30% founder's equity." Burton asked plaintiff to "[l]et me know how those numbers sound, and if those equity levels are adequate for you to feel like a true partner and co-founder (which you will be)." Burton also set out "what the equity upside for DroneBase might look like" under a variety of different scenarios.

3

Plaintiff responded by email that "[o]f the two options outlined, I prefer the 95k salary with 40% founder's equity," and stated that he was "ready to sign an official agreement to solidify everything we've discussed." Burton responded that he, too, was ready "to make a formal commitment to our partnership and to DroneBase." He proposed to contact his law firm to "have them start all official paperwork (including your equity shares, etc.). At the same time, I will ask them to work up a simple one-pager in writing (that we can both sign) that spells out what we discussed so you can be confident in the terms of our partnership. If possible, I would also like to meet briefly on Friday morning to shake your hand as my word is as important as formal paperwork to me." Plaintiff responded that "[t]he process you outlined sounds great," and he agreed "to meet on Friday morning to sign documents and shake hands."

On October 8, Burton emailed plaintiff a formal offer letter (offer letter), to which a "Proprietary Information Agreement" (PIA) was attached. Burton's email said as follows: "This document reflects our previous discussions and I would be more than happy to walk you through the entire document if helpful. Please read through it and let me know if you have any questions. [¶] . . . [¶] On the first page or two, you will find the salary level, equity issuance (that reflects 40% of Founder's Equity), and health care coverage as we discussed. For your information, only you and I will have Class E shares (which have special rights)—hired employees will be issued Class A shares. [¶] The rest of the document outlines some IP and non-disclosure issues drafted by our law firm. Again, please let me know of any issues. [¶] If this document works for you, please sign and send back to me, and we can consider it executed. If you have any

4

questions whatsoever, I am happy to get on the phone . . . or answer via email. If you would prefer to review in person Friday morning, that works too. [¶] Regardless, I hope that we can shake hands Friday morning and start this partnership together."

Plaintiff responded the following day, October 9, as follows: "I know you'll be traveling today, but do you have to time to talk briefly on the phone? I have a few questions about the equity classes for DroneBase and my start date." Burton responded: "Of course. . . . I am happy to clarify any questions you might have and can reach out to the law firm if we have any remaining questions after our call."

Later on October 9, plaintiff emailed Burton, "I am so happy to accept the offer to work at DroneBase as your partner. Attached is the signed offer letter. Let's conquer the world!"

B.    *The Offer Letter and PIA*

1.    Offer Letter

The offer letter provided that plaintiff would join DroneBase as "Co-Founder and Chief Technology Officer" and would "be responsible for such duties and responsibilities consistent with your title of Co-Founder and Chief Technology Officer, and any other areas of responsibility as determined or assigned to you by the Company from time to time." Plaintiff would receive compensation in the form of a base salary of $95,000 per year and benefits, plus equity in the form of 4,382,895 shares of the company's Class E common stock. Twenty-five percent of plaintiff's stock would vest on the first anniversary of plaintiff's start date, and the remaining 75 percent would vest in equal monthly installments, such that it would be fully vested by the fourth anniversary of plaintiff's start date.

The offer letter provided that plaintiff would be required to execute the attached PIA "[a]s a condition of your employment with the Company." It also said that plaintiff's employment with the company was at-will, and that the offer letter and PIA reflected "the entire agreement regarding the terms and conditions of [plaintiff's] employment. Finally, the offer letter contained a "Disputes" provision, which provided as follows:

"To ensure rapid and economical resolution of any disputes which may arise under this letter agreement, the Company and you agree that any and all disputes or controversies of any nature whatsoever, arising from or regarding the interpretation, performance, enforcement, or breach of this letter agreement shall be resolved by confidential, final and binding arbitration (rather than trial by jury or court or resolution in some other forum) to the fullest extent permitted by law. Any arbitration proceeding pursuant to this Agreement shall be conducted by the American Arbitration Association ('AAA') in San Diego County, California under the then existing employment-related AAA arbitration rules. **You acknowledge that by agreeing to this arbitration procedure, both you and the Company waive the right to resolve any such dispute through a trial by jury or judge or by administrative proceeding.** The arbitrator shall: (a) have the authority to compel adequate discovery for the resolution of the dispute and to award such relief as would otherwise be permitted by law; and (b) issue a written arbitration decision including the arbitrator's essential findings and conclusions and a statement of the award. The arbitrator shall be authorized to award any or all remedies that you or the Company would be entitled to seek in a court of law. The Company shall pay all AAA arbitration fees in excess of

6

those which would be required if the dispute were decided in a court of law. Nothing in this Agreement is intended to prevent either you or the Company from obtaining injunctive relief in court to prevent irreparable harm pending the conclusion of any such arbitration. Notwithstanding the foregoing, you and the Company each have the right to resolve any issue or dispute arising under the Proprietary Information Agreement by court action instead of mediation or arbitration. If for any reason all or part of this arbitration provision is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other portion of this arbitration provision or any other jurisdiction, but this provision will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal or unenforceable part or parts of this provision had never been contained herein, consistent with the general intent of the parties insofar as possible. This letter agreement shall be construed and interpreted in accordance with the laws of the State of California."

"**I have read this paragraph . . . and irrevocably agree to arbitrate any dispute as identified above.** (Your initials.)"

Plaintiff placed his initials after the above paragraph.

2.      Proprietary Information Agreement

The Proprietary Information Agreement attached to the offer letter stated that "[i]n consideration of my employment or continued employment by DroneBase, Inc. and its affiliates and/or subsidiaries (the 'Company'), and the compensation now and hereafter paid to me," plaintiff agreed to a variety of terms, including to hold the company's propriety information in strictest

confidence, to assign to DroneBase the rights to any inventions made or conceived by him during the period of his employment, and to assist DroneBase in obtaining proprietary rights to company inventions. Plaintiff also agreed not to solicit any company employee to leave the company, and to return to the company all drawings, notes, customer lists, devices, and other materials when he left the company's employ.

Section 7 of the PIA, entitled "Legal and Equitable Remedies," stated as follows: "In order to prevent irrevocable harm to myself or the Company from any breach of this Agreement, the Company and I shall both have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the parties may have for a breach of this Agreement." Additionally, section 10.1, "Governing Law; Consent to Personal Jurisdiction," stated as follows: "This Agreement will be governed by and construed according to the laws of the State of California, as such laws are applied to agreements entered into and to be performed entirely within California between California residents. Subject to the Arbitration Agreement, if any, between the parties, the parties hereby expressly consent to the personal jurisdiction of the state and federal courts located in San Diego, California for any action filed there pursuant to Section 7 herein."

C. *Plaintiff's Termination; Present Action*

DroneBase terminated plaintiff's employment in April 2018. Thereafter, plaintiff filed a complaint against DroneBase and Burton for actual and constructive fraud, concealment, breach of fiduciary duty, negligent misrepresentation, promissory estoppel, and breach of

8

partnership agreement. In brief, the complaint alleged that before Burton began negotiating with plaintiff in 2014, he had already committed a substantial portion of the company's equity to investors through "Simple Agreements for Future Equity," or SAFEs. Burton concealed the SAFEs from plaintiff and "continued to mislead [plaintiff] into thinking he had received the 40% equity in DroneBase he had been promised." Plaintiff learned of the SAFEs for the first time in 2016, when he discovered that he owned only about 13 percent of DroneBase. Burton promised to restore plaintiff's equity, but he never did so, and thus plaintiff currently held only about seven percent of the company's equity. Plaintiff alleged that DroneBase was worth about $200 million, and thus that he had been damaged in excess of $65 million.

### D. Defendants' Motion to Compel Arbitration

Defendants filed a motion to compel arbitration of plaintiff's claim. Defendants urged that all of plaintiff's claims were subject to the arbitration provision of the offer letter and, further, that the arbitration provisions satisfied the requirement of " 'essential fairness.' "

Plaintiff opposed the motion to compel. He urged, first, that his claims were not within the scope of the arbitration provision because "[n]owhere does [plaintiff] allege a breach of the Offer Letter or make any allegations about his termination from DroneBase . . . . Instead, [plaintiff's] causes of action arise from the partnership he entered into with Burton, which was memorialized in a handshake deal." Next, plaintiff contended the arbitration agreement was substantively unconscionable because it excluded virtually any claim DroneBase might bring against plaintiff; defendants did not initial the arbitration provisions; the

9

selected forum (San Diego) had no relationship to the parties or the dispute; the arbitration provision was procured by fraud; and the arbitration rules were not attached to the offer letter. Finally, plaintiff urged that the agreement was one of adhesion and thus was procedurally unconscionable.

In a supporting declaration, plaintiff said Burton had not disclosed that the offer letter contained an arbitration provision, instead representing that it contained the terms the parties had previously discussed. Plaintiff, who is not a lawyer, "[was] not readily familiar with legal terminology or what rights [he] would be giving up by signing the agreement." He therefore had a further telephone conversation with Burton the next day, during which he said he was considering retaining legal counsel. Burton "represented to [plaintiff] that any contracts that [he] signed were a mere formality, and that the emails [they] exchanged and oral agreements [they] made governed the terms of [their] partnership." Burton also "discouraged [plaintiff] from retaining legal counsel . . . and reemphasized that he was a man of integrity and [plaintiff] could trust him." Accordingly, "[i]n reliance on [Burton's] representations," plaintiff signed the offer letter.

The trial court granted defendants' petition to compel arbitration. The court said it was not persuaded plaintiff had not read the offer letter and was not aware that it contained an arbitration provision; alternatively, even if plaintiff failed to read the offer letter before signing it, that would not be a ground to avoid arbitration. Further, the court found the dispute was within the scope of the arbitration provision. The court noted that the offer letter provided that plaintiff would have shares in the company, would be a company co-founder, and would hold the

position of Chief Technology Officer. Because "the gravamen of the complaint is plaintiff's position in the company, whether he is a partner, and the share of equity to which he is entitled," the complaint thus arose under the offer letter and was within the scope of the arbitration provision.

The court also found the arbitration provision was not procedurally or substantively unconscionable. The court found the provision was not procedurally unconscionable because plaintiff negotiated the terms of his employment offer and could readily have accessed the AAA arbitration rules, and it was not substantively unconscionable because both parties potentially could have claims under the PIA that would not be subject to arbitration. The court explained: "Because the issues in [the PIA] concern a large part of plaintiff's duties at the company, it is not clear that he would never have a claim under that contract. It is also not clear there was an intent to exclude employer claims as much as an intent to exclude claims under the [PIA]." Finally, the court found that requiring the arbitration to take place in San Diego raised unconscionability concerns, but that provision could be severed from the agreement.

### E. *Arbitration and Award*

The case was tried to an arbitrator over five days in July and August 2019. Among other things, plaintiff contended that Burton intentionally or negligently misled him about the real value of the 40 percent equity plaintiff was promised for joining DroneBase. Plaintiff asserted that Burton never disclosed to him that DroneBase had already entered into SAFEs, which had the effect of diluting plaintiff's 40 percent interest in DroneBase.

11

On September 23, 2019, the arbitrator issued a Partial Final Award, ruling against plaintiff on each of his causes of action. In brief, the arbitrator concluded that while both plaintiff and Burton made assumptions that led to mutual misunderstandings, the evidence failed to demonstrate that Burton made any statements to plaintiff that were intentionally false or likely to deceive. He explained that a SAFE "does not create an ownership interest in the conventional sense, and it is not a debt subject to repayment or with specific maturity dates upon which repayment is due." Instead, an investor "receives the right to purchase stock in a future equity round (when and if one occurs) subject to certain parameters set in advance in the SAFE." The relevant question, therefore, was whether plaintiff "understood or should have understood that [his founder's stock] was subject to dilution without further infusion of capital because of the previous utilization of SAFEs." The arbitrator concluded that although Burton "did not expressly disclose the existence of the SAFEs by using that term or explaining precisely what a SAFE does," there was no evidence that plaintiff "was precluded in any way from information about the company or that access to financial information was expressly withheld from him in his due diligence." Further, the arbitrator concluded, "there is no persuasive basis to conclude Burton intended to mislead, concealed information, precluded access to information or otherwise sought to induce [plaintiff] to join DroneBase through artifice." The arbitrator thus concluded that plaintiff should take nothing by way of his demand.

On November 7, 2019, the arbitrator issued a final award that awarded DroneBase costs of $63,156 as the prevailing party, and provided that plaintiff would take nothing on his claims.

*F.     Petitions to Confirm and Vacate Arbitration Award*

Defendants filed a petition to confirm the arbitration award, and plaintiff filed a petition to vacate.  As relevant here, plaintiff contended the award should be vacated because (1) the arbitrator exceeded his authority by excluding plaintiff from portions of the arbitration proceedings; (2) the arbitration provision was substantively unconscionable because it required arbitration in San Diego and excluded claims arising under the PIA, which are claims that only defendants would be likely to bring; (3) the arbitration provision was procedurally unconscionable because it was a contract of adhesion, Burton misled plaintiff about the contents of the offer letter, and plaintiff was not provided with a copy of the AAA rules; and (4) plaintiff's claims fell outside the scope of the arbitration clause.

The trial court denied the petition to vacate and granted the petition to confirm.  The court declined to revisit the order compelling arbitration, saying that "is a matter for an appellate court."  The court further concluded that the arbitrator did not exceed his powers by excluding plaintiff from portions of the arbitration hearing.  The court noted that plaintiff was excluded only when his attorney questioned Burton about "Attorneys Eyes Only" documents, and thus the exclusion was consistent with the parties' stipulated protective order, which gave the arbitrator authority to determine the extent of the disclosure of such materials at the hearing.

The court entered judgment confirming the arbitration award on July 15, 2020.  Plaintiff timely appealed.

## DISCUSSION

On appeal, plaintiff contends: (1) the arbitration agreement is substantively and procedurally unconscionable; (2) plaintiff's

13

claims are outside the scope of the arbitration agreement; and (3) the arbitrator exceeded his authority by excluding plaintiff from portions of the arbitration proceeding.  We consider these issues below.

## I.

### The Arbitration Agreement Is Not Unconscionable

Plaintiff contends the trial court erred by ordering the dispute to arbitration because the arbitration agreement is both substantively and procedurally unconscionable, and the unconscionable provisions cannot be severed.  For the reasons that follow, we conclude plaintiff's contention lacks merit.

We begin by reviewing general principles of unconscionability.  " 'One common formulation of unconscionability is that it refers to " 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' " [Citation.]  As that formulation implicitly recognizes, the doctrine of unconscionability has both a procedural and a substantive element.' " (*Sonic–Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1133.)

" ' "The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability." [Citation.]  But they need not be present in the same degree. . . .  [T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' (*Armendariz v. Foundation Health Psychcare Services, Inc*. (2000) 24 Cal.4th 83,

14

114 (*Armendariz*).)" (*Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1243–1244 (*Baltazar*).)

On appeal, unconscionability findings are reviewed de novo if they are based on declarations that raise no meaningful factual disputes. If an unconscionability determination is based on the trial court's resolution of conflicts in the evidence, we consider the evidence in the light most favorable to the court's determination and review those aspects of the determination for substantial evidence. (*Samaniego v. Empire Today, LLC* (2012) 205 Cal.App.4th 1138, 1144.)

A. *Substantive Unconscionability*

Plaintiff contends the arbitration agreement is substantively unconscionable because it requires him to arbitrate his most likely claims against defendants, but allows defendants to litigate their most likely claims against him. We agree.

"Substantive unconscionability focuses on overly harsh or one-sided results. (See *Armendariz, supra*, 24 Cal.4th at p. 114.) 'In assessing substantive unconscionability, the paramount consideration is mutuality.' [Citation.] This does not mean that parties may not choose to exclude particular types of claims from the terms of arbitration. However, 'an arbitration agreement imposed in an adhesive context lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence or series of transactions or occurrences.' (*Armendariz, supra*, 24 Cal.4th at p. 120.)" (*Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 723.)

In *Fitz v. NCR Corp., supra*, 118 Cal.App.4th 702 (*Fitz*), the court considered the enforceability of an arbitration agreement that required arbitration of most disputes between an employer

15

and employee, but exempted " 'disputes over confidentiality/non-compete agreements or intellectual property rights.' " (*Id.* at p. 709.)  The court concluded that this provision was substantively unconscionable because "it compels arbitration of the claims more likely to be brought by Fitz, the weaker party, but exempts from arbitration the types of claims that are more likely to be brought by NCR, the stronger party." (*Id.* at p. 725.)  It explained that the mandatory arbitration provision " 'can only realistically be seen as applying primarily if not exclusively to claims arising out of the termination of employment, which are virtually certain to be filed against, not by, [the employer].' " (*Ibid.*)  In contrast, "[a] substantial portion of the claims NCR is most likely to initiate against employees, 'such as claims that an employee violated a non-competition agreement or divulged confidential information—need not be arbitrated.' " (*Ibid.*)  Thus, although the arbitration exclusion was facially bilateral, it was unfairly one-sided in practice.  (*Ibid.*)

The court similarly concluded in *Davis v. Kozak* (2020) 53 Cal.App.5th 897, 903 (*Davis*).  There, an arbitration agreement required an employee to arbitrate " '[a]ny and all disputes which involve or relate in any way to [his] employment (or termination of employment) with Red Bull, *except for obligations under the Employee Confidentiality Agreement with Red Bull.*' "  (Italics added.)  The court concluded the agreement was substantively unconscionable because it required the employee to arbitrate the claims he was most likely to bring against the employer, but effectively exempted from arbitration the types of claims Red Bull was most likely to bring against an employee.  (*Id.* at p. 916.)  The court explained that the confidentiality agreement required employees to maintain the

16

confidentiality of the company's confidential information, but contained no corresponding obligation by the company to protect employees' confidential information. Thus, although the carve-out for claims under the confidentiality agreement facially applied to both employee and employer, any theoretical claim the employee might have against the employer for misuse of his intellectual property "is not a dispute involving the breach of any 'obligations' under the confidentiality agreement and would therefore fall within the scope of the parties' arbitration agreement." (*Ibid.*) Further, "and in a broader sense, the arbitration agreement effectively exempts from arbitration the types of claims Red Bull is most likely to bring against an employee such as [the plaintiff]." (*Ibid.*) Finally, the company failed to articulate any legitimate business reasons for the exemption. (*Id.* at p. 917.) Accordingly, the court said, the arbitration agreement contained "a 'high' degree of substantive unconscionability." (*Ibid.*; see also *Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 175 [agreement which required arbitration of most employment-related claims, but not unfair competition or intellectual property claims, was substantively unconscionable because it "require[d] arbitration of most claims of interest to employees but exempt[ed] from arbitration most claims of interest to [employer]"].)

The present case is analogous to *Davis* and *Fitz*. The offer letter executed by plaintiff and defendants required arbitration of "any and all disputes or controversies of any nature whatsoever, arising from or regarding the interpretation, performance, enforcement or breach of this letter agreement," but excluded from arbitration "any issue or dispute arising under the Proprietary Information Agreement." As in *Davis* and *Fitz*, the

17

PIA imposed obligations only on plaintiff, not on defendants. Thus, as in those cases, although the arbitration exclusion here appeared to apply bilaterally, its effect was to require plaintiff to arbitrate any claims he might have against defendants, but to permit defendants to litigate many potential claims against plaintiff. As in *Davis* and *Fitz*, therefore, the parties' agreement required arbitration of employment-related claims most likely to be brought by plaintiff, but excluded from arbitration intellectual property and proprietary information claims most likely to be brought by defendants.

Defendants contend the arbitration agreement is not unfairly one-sided because "intellectual property rights are critical to *both* [plaintiff] and [defendants]." We do not agree. Although the arbitration provision on its face excluded from arbitration claims brought by either party under the PIA, the PIA imposed obligations only on *plaintiff*. Thus, as a practical matter, plaintiff could not have a claim against defendant for breach of the PIA.

For these reasons, we conclude that the arbitration agreement is substantively unconscionable.[2]

B. *Procedural Unconscionability*

As noted above, substantive unconscionability, alone, is insufficient to disregard an arbitration agreement; procedural unconscionability must be present as well. " 'Procedural unconscionability focuses on " ' "oppression" ' " or " ' "surprise" ' "

_____

[2] Having concluded that the arbitration agreement is substantively unconscionable because it is not bilateral, we need not consider whether it also was substantively unconscionable for other reasons.

due to unequal bargaining power.  [Citation.]  "Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice.  Surprise involves the extent to which the supposedly agreed-upon terms are hidden in a prolix printed form drafted by the party seeking to enforce them." '  [Citation.]"  (*Davis, supra,* 53 Cal.App.5th at p. 906.)

Plaintiff contends the arbitration agreement is procedurally unconscionable for three separate reasons:  (1) it is a contract of adhesion; (2) Burton misrepresented the contents of the offer letter; and (3) Burton failed to provide plaintiff with a copy of the AAA rules.[3]  As we discuss, these claims lack merit.

1.    Adhesive Nature of Offer Letter

Plaintiff contends that the arbitration agreement is procedurally unconscionable because it is a contract of adhesion—i.e., a " 'standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' "  (*Armendariz, supra,* 24 Cal.4th at p. 113.) Our Supreme Court has explained that although contracts of adhesion are " 'indispensable facts of modern life that are generally enforced,' " they contain a " 'degree of procedural unconscionability even without any notable surprises, and "bear within them the clear danger of oppression and overreaching." ' "

---

[3]    Plaintiff does not argue any "surprise" based on the terms of the arbitration agreement being hidden in a prolix printed form, nor could he.  The offer letter was only three pages, the arbitration agreement was in the same size font as the rest of the document and was in part in bolded print, and plaintiff initialed it.

19

(*Baltazar*, *supra*, 62 Cal.4th 1237, 1244.) This danger is particularly acute in the employment setting, "where 'economic pressure exerted by employers on all but the most sought-after employees may be particularly acute.' " (*Ibid.*)

Plaintiff contends the arbitration agreement in the present case was adhesive because it was prepared by Burton's lawyers and was not negotiated. We do not agree. Our Supreme Court has said that a contract is adhesive if it is "imposed on employees as a condition of employment and there [is] no opportunity to negotiate." (*Armendariz*, *supra*, 24 Cal.4th at p. 115.) Whether a contract is adhesive thus turn on whether an employee had *the opportunity* to negotiate—not whether he actually did so. (See *Spinello v. Amblin Entertainment* (1994) 29 Cal.App.4th 1390, 1397 [contract was not adhesive because plaintiff "had the opportunity to negotiate and simply failed to do so"].)

Plaintiff cites no evidence for the proposition that the arbitration provision was not negotiable—and, indeed, the record suggests otherwise. In the email to which Burton attached the offer letter, he offered to "walk you through the entire document if helpful," to answer "any questions," and to "edit if required." Specifically with regard to provisions "drafted by our law firm," Burton invited plaintiff to "let me know of any issues." Burton concluded that the offer letter could be signed and returned "[if it] works for you," but said that if plaintiff had any questions, "I am happy to get on the phone . . . or answer via email . . . [or] review in person Friday morning." In short, nothing in this email or any of the other communications between the parties suggests either that Burton would not have been willing to negotiate the arbitration provision or that such provision was a condition of plaintiff's employment. To the contrary, the tenor of the

20

correspondence suggested that Burton intended the offer letter as a starting point for discussion, which could be edited if necessary.

Nor do we agree with plaintiff that the offer letter and PIA are contracts of adhesion because they "were standard contracts employees were required to sign if they wanted to work at DroneBase." As defendants correctly note, when plaintiff signed the offer letter in October 2014, DroneBase could not yet have had a "standard" employee contract because plaintiff was DroneBase's first employee. Nor was plaintiff a typical employee: as the co-founder and chief technology officer, plaintiff unquestionably had more bargaining power than most hirees.

We also reject plaintiff's suggestion that the arbitration provision was adhesive because Burton presented the offer letter to plaintiff at the conclusion of their negotiations, after plaintiff had turned down other job offers. While the September 27, 2014 email to which plaintiff cites states that plaintiff was "*about to* reject Google and Roku's offers that are currently on the table" (italics added), there is no evidence either that plaintiff turned down these offers before he received the offer letter on October 8 or that he did not have other pending job offers. As such, we cannot conclude that the arbitration provision was adhesive. (Compare *Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, 1534 [employee presented with arbitration agreement more than a month after he signed the employment contract].)

Finally, we reject plaintiff's contention that the circumstances of his hiring were analogous to those in *Stirlen v. Supercuts, Inc.*, *supra*, 51 Cal.App.4th 1519 (*Stirlen*), in which an arbitration agreement entered into by a high-level corporate executive was found to be procedurally unconscionable. *Stirlen* concerned an arbitration agreement entered into between a large

corporation and plaintiff Stirlen, who was hired as the corporation's vice-president and chief financial officer. (*Id*. at p. 1525.) The corporation contended the arbitration agreement was not adhesive because the plaintiff "was not a person desperately seeking employment but a successful and sophisticated corporate executive Supercuts sought out and 'hired away' from a highly paid position with a major corporation 'by offering him an annual salary of $150,000, and then agreeing to remunerative "extras" not included in the standard executive employment agreement,' such as generous stock options, a bonus plan, a supplemental retirement plan, and a $10,000 'signing bonus.'" (*Id*. at p. 1533.) The court was unpersuaded. It noted that the contract was presented to the plaintiff after he accepted employment and was described as containing standard provisions that were not negotiable. Further, while the parties negotiated the terms of the plaintiff's salary, stock options, bonus, and retirement plan, those matters were the subject of a separate letter agreement the plaintiff signed more than a month before he signed the employment contract. Finally, the corporation did not dispute the plaintiff's assertion that the employment contract was presented to him on a " 'take it or leave it basis.'" (*Id*. at p. 1533–1534.) Under these circumstances, the court concluded that the agreement to arbitrate was adhesive. (*Id*. at p. 1534.)

There are significant differences between the present case and *Stirlen*. Unlike Stirlen, who was not presented with the arbitration agreement until a month after he signed a letter agreement accepting the job, the arbitration agreement in the present case was *part of* plaintiff's offer letter. The arbitration agreement thus was not a provision foisted on the plaintiff after he accepted the position with DroneBase, but a part of the vehicle

22

by which he accepted that employment. Further, unlike in *Stirlen*, the arbitration provision was not part of a standard employment contract "that every other corporate officer was required to and had signed" (*id*. at p. 1534); to the contrary, as we have said, because plaintiff was DroneBase's first employee, the company could not yet have created a "standard" employment contract. We therefore do not detect in the present case the procedural unconscionability the court identified in *Stirlen*.

2.  Burton's Alleged Misrepresentation Regarding the Offer Letter's Contents

Plaintiff next contends that the arbitration provision is procedurally unconscionable because Burton misled plaintiff about the offer letter's contents. Plaintiff notes that Burton described the offer letter as " 'reflect[ing] our previous discussions' " and downplayed the offer letter's significance, telling plaintiff that "my word is as important as formal paperwork to me." Plaintiff thus suggests that he should not be bound by the arbitration provision because a " 'plaintiff's failure to read a contract is excusable where reliance is placed on the misrepresentations of the other party.' "

There are several problems with plaintiff's contention, including that it is clear that plaintiff *did* read the offer letter. On October 8, plaintiff emailed Burton "I will review the offer letter tonight and try to get it back to you tomorrow." The next day, he asked Burton in an email whether they could set up a phone call because he had "a few questions about the equity classes for DroneBase and my start date." Plainly, plaintiff could not have had questions about provisions of the offer letter had he not read it.

23

Nor do we agree with plaintiff's suggestion that Burton misled him by describing the offer letter as " 'reflect[ing] our previous discussions.' " While Burton's October 8 email does refer to the parties' previous discussions, it also notes that the offer letter contains some additional provisions "drafted by our law firm," and it invited plaintiff to "please let me know of any issues" with those provisions. Plaintiff thus could not have been misled into believing that the offer letter contained only the contents of the parties' previous discussions because Burton's email explicitly said otherwise.

Finally, we do not agree with plaintiff that the present case is analogous to *Lynch v. Cruttenden & Co.* (1993) 18 Cal.App.4th 802 (*Lynch*), where the Court of Appeal affirmed an order denying a petition to compel arbitration because the defendant misled the plaintiffs about the legal effect of an arbitration agreement. *Lynch* concerned an arbitration provision in a brokerage contract entered into between a licensed security broker and his clients, who were also his personal friends. (*Id.* at p. 805.) The *Lynch* plaintiffs alleged that after they opened brokerage accounts with the defendant, defendant periodically instructed them to sign various documents, but told them that the documents "did not affect legal rights" and need not be read. (*Ibid.*) In fact, the documents required the plaintiffs to submit disputes to arbitration. (*Id.* at p. 806.) The Court of Appeal held that the plaintiffs could not be compelled to arbitrate because they alleged that they "were so deceived *they did not understand they were contracting.*" (*Id.* at p. 811, italics added.)

The present case is distinguishable. Unlike the plaintiffs in *Lynch*, plaintiff does not contend that he did not know he was signing a contract; he asserts only that he was unaware that the

24

contract into which he was entering contained an arbitration provision.  The result in this case, therefore, is not governed by *Lynch*.  (Contrast *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 419–420 ["California law supports [the] position that fraud does not render a written contract *void* where the defrauded party had a reasonable opportunity to discover the real terms of the contract.  A contract may, however, be held wholly void, despite the parties' apparent assent to it, when, ' "*without negligence on his part*, a signer attaches his signature to a paper assuming it to be a paper of a different character" ' "].)

> 3. <u>Failure to Provide Plaintiff With Copy of AAA Rules</u>

Finally, plaintiff contends the arbitration agreement is procedurally unconscionable because defendants did not provide him with a copy of the AAA rules.  Our Supreme Court rejected a similar contention in *Baltazar*, *supra*, 62 Cal.4th 1237.  There, the plaintiff urged that an arbitration agreement was procedurally unconscionable because the defendant had not provided her with a copy of AAA's arbitration rules.  (*Id*. at p. 1246.)  The Supreme Court disagreed, explaining as follows: "[Plaintiff] relies on *Trivedi* [*v. Curexo Technology Corp.* (2010) 189 Cal.App.4th 387], which notes that '[n]umerous cases have held that the failure to provide a copy of the arbitration rules to which the employee would be bound supported a finding of procedural unconscionability.' (*Trivedi*, *supra*, 189 Cal.App.4th at p. 393, citing cases.)  But in *Trivedi* itself and in each of the Court of Appeal decisions cited therein, the plaintiff's unconscionability claim depended in some manner on the arbitration rules in question.  [Citations.]  These cases thus stand

for the proposition that courts will more closely scrutinize the substantive unconscionability of terms that were 'artfully hidden' by the simple expedient of incorporating them by reference rather than including them in or attaching them to the arbitration agreement. [Citation.] Baltazar's argument accordingly might have force if her unconscionability challenge concerned some element of the AAA rules of which she had been unaware when she signed the arbitration agreement. But her challenge to the enforcement of the agreement has nothing to do with the AAA rules; her challenge concerns only matters that were clearly delineated in the agreement she signed. Forever 21's failure to attach the AAA rules therefore does not affect our consideration of Baltazar's claims." (*Baltazar*, *supra*, 62 Cal.4th at p. 1246.)

As in *Baltazar*, plaintiff's challenge is to the arbitration clause *itself*, not to any particular provisions of the AAA rules. As such, Burton's failure to provide plaintiff with a copy of those rules does not affect our consideration of plaintiff's unconscionability claims.

## II.
## This Lawsuit Is Within the Scope of the Arbitration Provision

Plaintiff contends the present litigation falls outside the scope of the arbitration provision. We do not agree.

" 'The scope of arbitration is . . . a matter of agreement between the parties . . . .' (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 323.)" (*In re Tobacco Cases I* (2004) 124 Cal.App.4th 1095, 1104.) " 'When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.' "

(*Sandquist v. Lebo Automotive, Inc*. (2016) 1 Cal.5th 233, 244.) However, " 'doubts concerning the scope of arbitrable issues are to be resolved in favor of arbitration. [Citations.] Therefore, in the absence of indication of contrary intent, and where the arbitration clause is reasonably susceptible of such an interpretation, claims . . . will be deemed subject to arbitration.' " (*In re Tobacco Cases I*, *supra*, 124 Cal.App.4th at p. 1104.)

In the present case, the arbitration provision required arbitration of "any and all disputes or controversies of any nature whatsoever, arising from or regarding the interpretation, performance, enforcement or breach of this letter agreement." Plaintiff contends the present case is outside the scope of this provision because his claims "did not ask the Court to construe the employment agreement," but instead were based on Burton's alleged oral misrepresentations.

It is true, as plaintiff suggests, that the arbitration provision facially applies to disputes arising out the letter agreement and does not specifically reference tort claims. However, several appellate courts have held that arbitration provisions similar to the one at issue here embrace tort claims, as well as contract claims. For example, in *EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1325 (*EFund Capital*), the plaintiff alleged that the defendants fraudulently induced it to invest in a new technology company, but then diverted the company's capital and intellectual property for defendants' own financial gain. The defendants moved to compel arbitration under a contract requiring arbitration of "[a]ny dispute or other disagreement arising from or out of this Consulting Agreement." (*Id*. at p. 1317.) The trial court denied the motion to compel, but the Court of Appeal reversed, concluding that plaintiff's tort

claims reasonably could be characterized as arising from or out of" the contract because the contract "established and governed plaintiff's relationship with [defendant]." (*Id*. at p. 1325.) The court explained: "In this case, plaintiff alleges defendants defrauded it out of its investment in RAP Technologies and any financial return on its moneys invested in the Loan Vibe software program. Plaintiff further asserts defendants harmed RAP Technologies by diverting the Loan Vibe software program to their own use for their own financial gain. . . . None of defendants is a named party to the strategic relationship agreement. But the strategic relationship agreement is the basis for plaintiff's contractual obligations to RAP Technologies and, by extension, to defendants. . . . If plaintiff and RAP Technologies had never entered into the strategic relationship agreement, the present disputes would never have arisen. . . . Therefore, the arbitration agreement extends to the disputes alleged in plaintiff's second amended complaint." (*Id*. at pp. 1325–1326.)

Similarly, in *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677 (*Coast Plaza*), the court considered whether a hospital's tort claims arising out of an insurer's termination of the parties' service agreement were subject to mandatory arbitration under a clause requiring arbitration of "[a]ny problem or dispute arising under this Agreement and/or concerning the terms of this Agreement." The plaintiff contended the claims were not arbitrable because the services agreement had been terminated prior to the filing of the action, and none of the plaintiff's claims were directed toward enforcing the contract. (*Id*. at p. 685.) The court disagreed, noting that it had "long been the rule in California that a broadly worded arbitration clause, such as we have here, may extend to

28

tort claims that may arise under or from the contractual relationship." (*Id.* at p. 686.)

The present case is analogous to *Efund Capital* and *Coast Plaza.* As in those cases, the arbitration provision was broadly worded, extending to any and all disputes arising out of the offer letter. The dispute between the parties unquestionably arose out of the business relationship created by the offer letter, and the dispute cannot be resolved without reference to the offer letter, including to its integration clause. Accordingly, the present dispute is subject to arbitration.

## III.

## The Arbitrator Did Not Exceed His Authority by Excluding Plaintiff from Portions of the Arbitration Proceeding

Plaintiff contends finally that the arbitrator exceeded his authority by excluding plaintiff from portions of the arbitration proceeding. For the reasons that follow, we disagree.

*A. Additional Facts*

During the arbitration proceeding, defendants requested that plaintiff be excluded from plaintiff's counsel's questioning of certain witnesses, including Burton, about financial projections designated "Attorneys Eyes Only" under the parties' stipulated protective order. Defendants' counsel argued that while plaintiff's counsel should be permitted to question Burton about those projections, plaintiff should not be permitted to hear such questioning because he was currently employed by a company evaluating drone services providers, including DroneBase. Plaintiff's counsel disagreed, contending that excluding plaintiff from the arbitration hearing raised due process concerns.

29

After reviewing the parties' protective order and relevant case law, the arbitrator ruled that he would not exclude plaintiff from the hearing, but that witnesses could not be examined on protected material in plaintiff's presence. The arbitrator explained: "[T]here's only one way that I think I can resolve this, Counsel, and that is I'm not going to exclude [plaintiff] because I do not believe that I have the authority to do it. I don't think that the protective order so provides. However, I am not going to permit the examination on the protected material [in plaintiff's presence] . . . because the [protective] order does provide that it shall not be disseminated to a party. And, therefore, it seems to me there is a choice . . . . [If plaintiff] wants to be present, that's fine. If [plaintiff] chooses not to be present, that's fine. If he's not present, I will permit inquiry with respect to the material. If he is present, then I will abide by the terms of the protective order."

After this ruling, plaintiff left the hearing during his counsel's examination of Burton about "Attorneys Eyes Only" documents. That examination occupied approximately 15 pages of the reporter's transcript, and it addressed only then-current discussions with other companies about strategic investments or acquisitions.

### B. *Analysis*

Plaintiff contends that he had the right to be present during all portions of the arbitration hearing, and that the arbitrator violated that right by excluding him during the examination of Burton on "Attorneys Eyes Only" documents. We conclude that we need not decide whether the arbitrator erred because any such error was not prejudicial.

Defendants contend, and plaintiff does not dispute, that the only questions posed to Burton in plaintiff's absence concerned

30

DroneBase's then-current strategic, financial, and operational situation—issues that were relevant only to the issue of damages. However, because the arbitrator found for defendants on liability, he did not reach the issue of damages. Any error with regard to damages testimony therefore could not have prejudiced plaintiff.

Although plaintiff concedes that the testimony from which he was excluded pertained to damages, he contends that "the Arbitrator's liability decision was influenced by damages issues," and thus that plaintiff's exclusion from the hearing was prejudicial. In support, he urges that "the Arbitrator found that [plaintiff's] expert's valuation of DroneBase was 'untenable' and rejected it, and that "[defendants'] expert testimony was 'persuasive' and that he 'used reliable methodology to conclude the fair market value of DroneBase was $20,284,000." In fact, while the arbitrator did make these findings, he also explicitly held that, "[i]n light of the Arbitrator's conclusions regarding the merits of the asserted causes of action, *damages are not found*." (Italics added.) We can conceive of no way in which the arbitrator's damages finding could have influenced his decision regarding liability, and thus we conclude that plaintiff's exclusion from some portions of the hearing, even if erroneous, was not prejudicial.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:


LAVIN, J.


EGERTON, J.